IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. NO. 23-00070-JB |
| v. | USAO NO. 20R00251 |
| CRAIG D. PERCIAVALLE<br>JOSEPH A. RUNKEL<br>WILLIAM O. ADAMS | VIOLATIONS: 18 U.S.C. § 1349<br>18 U.S.C. § 1343<br>18 U.S.C. § 2(a) |

## INDICTMENT

**THE GRAND JURY CHARGES**:

### INTRODUCTION

At all times relevant to this Indictment:

#### The Defendants and Relevant Entities and Individuals

1. Austal USA, LLC was a shipbuilder based in Mobile, Alabama, and a subsidiary of Austal Limited, an international shipbuilding company based in Australia. One of the ship classes that Austal USA built was the U.S. Navy's Independence-class Littoral Combat Ship (LCS). Austal USA built the LCS ships under contracts with the U.S. Navy and designated the individual vessels with even numbers (LCS-6, -8, -10, etc.).

2. Austal Limited was a publicly-traded company that listed its shares on the Australian Securities Exchange (ASX). Austal Limited also offered American Depositary Receipts for purchase in the over-the-counter market in the United States. Each American Depositary Receipt was equivalent to ten ordinary shares of Austal Limited traded on the ASX. Austal USA's revenues constituted approximately 80% of Austal Limited's total annual revenue between in or around 2013 and in or around 2016.

1

3. **CRAIG D. PERCIAVALLE** was Austal USA's President. **PERCIAVALLE** had significant responsibility for Austal USA's shipbuilding and financial operations. At times, **PERCIAVALLE** communicated directly to shareholders of Austal Limited about the company's performance.

4. **JOSEPH A. RUNKEL** was Austal USA's Director of Financial Analysis. Among other duties, **RUNKEL** was responsible for preparing certain financial information that he provided to interested parties for the final preparation of Austal USA's accounting records, including to Austal USA's independent auditors. **RUNKEL** also conducted separate analyses and reporting regarding Austal USA's financial performance on its shipbuilding contracts. **RUNKEL** reported to Austal USA's Chief Financial Officer, CC-1, who was responsible for overseeing Austal USA's accounting records. CC-1 is now deceased.

5. From in or around 2010 until in or around July 2015, **WILLIAM O. ADAMS** was Austal USA's Program Director over the LCS program and was responsible for approving financial information about the LCS program that was sent to the Finance Department for use in the final preparation of Austal USA's accounting records. **ADAMS** also provided information about Austal USA's financial performance on the LCS program to Austal USA's independent auditors. From at least in or about 2013 until in or about 2015, **ADAMS** reported directly to **PERCIAVALLE**.

6. Austal USA relied on shipbuilding cost estimates called "estimates at completion" (EACs) to calculate the profitability of each vessel, including those in the LCS program, and to prepare Austal USA's overall financial reporting. EACs represented the estimated total cost to complete a project (for Austal USA, a vessel) at any given point in time. The EACs were calculated by adding the actual costs to date for a vessel to the estimated remaining cost to

2

complete the vessel (ETC). Generally, the lower the EACs recorded by Austal USA, the higher the profit Austal USA reported in its financial statements, provided that Austal USA's revenue remained the same. Similarly, when Austal USA raised the EACs it recorded, it generally resulted in lower profit, if the revenue it received from the contract remained the same. To report accurate financial results, Austal USA needed to provide management's best estimate of the probable outcome for its EACs on the ships.

7. The LCS program EACs included estimates of both the costs to purchase materials and subcontracts for ship construction (non-labor EACs) and the labor costs for building the ships (labor EACs).

8. Austal USA compiled final EACs and information about the LCS program into a monthly Board Report and distributed it to Austal USA's Board of Directors, which included certain Austal Limited executives. Similarly, Austal USA regularly prepared accounting records that it transmitted to Austal Limited. Austal Limited used this information from Austal USA to report information about the performance of the LCS program and financial information to various parties, including shareholders, the investing public, and financial institutions.

9. Austal Limited published and released to its shareholders, the investing public, and financial institutions various reports and announcements concerning its business operations, including the financial performance of Austal Limited, Austal USA, and the LCS program. This included annual reports and semi-annual reports that contained financial statements that Austal Limited represented as a "true and fair view" of the financial position of Austal Limited. In addition to Austal Limited's published and released announcements, Austal Limited and Austal USA executives, including **PERCIAVALLE**, presented financial and other information to

shareholders, the investing public, and financial institutions through earnings calls and other presentations.

## Austal USA's Auditors

10. An independent auditor is a certified public accountant who examines the financial statements that a company's management has prepared. Austal USA retained Accounting Firm 1 to perform an independent audit of Austal USA's financial statements for fiscal years 2014, 2015, and 2016, and to provide an opinion that Austal USA's financial statements were free from material misstatements, used appropriate accounting policies, included reasonable significant accounting estimates by management, and overall fairly presented, in all material respects, the financial position of Austal USA. Austal Limited received Accounting Firm 1's opinion regarding Austal USA in connection with the preparation of financial statements and other information Austal Limited published, released, and presented to shareholders, the investing public, and financial institutions. Accounting Firm 1 also conducted half-year reviews in 2014, 2015, and 2016, which were more limited in scope than the full-year audits.

11. Accounting Firm 1 relied on **PERCIAVALLE, RUNKEL, ADAMS,** and other Austal USA employees to provide truthful and accurate information about Austal USA's financial condition and operations, including those involving the LCS program, in order for Accounting Firm 1 to provide an accurate and reliable audit opinion that Austal USA's financial statements were free from material misstatements, used appropriate accounting policies, included reasonable significant accounting estimates by management, and overall fairly presented, in all material respects, the financial position of Austal USA. Accounting Firm 1 obtained this information from **PERCIAVALLE, RUNKEL, ADAMS**, and other Austal USA employees through phone calls,

meetings, emails, and signed letters from management (referred to as "management representation letters") certifying to Accounting Firm 1 that certain facts were true.

## THE SCHEME TO DEFRAUD

### Overview of the Scheme to Defraud

12. **PERCIAVALLE, RUNKEL, ADAMS**, and others agreed and schemed to make and cause others to make false and misleading statements about Austal USA's financial performance on the LCS program and Austal USA's overall financial condition to defraud Austal Limited's shareholders and the investing public.

13. Specifically, beginning at least in or around 2013, **PERCIAVALLE, RUNKEL, ADAMS**, and others knew that Austal USA's LCS shipbuilding program was underperforming and over budget. With this knowledge, they intentionally provided and caused others to provide false and fraudulent financial information and other information about the LCS program to members of Austal USA's Board of Directors, Accounting Firm 1, and Austal Limited, including for dissemination to Austal Limited's shareholders and the investing public. To do so, **PERCIAVALLE, RUNKEL, ADAMS**, and others artificially reduced and suppressed EACs to levels that were unrealistic and materially different from management's best estimates and provided materially false and misleading information about Austal USA's progress on its LCS vessels to conceal problems with meeting financial metrics for the performance of the program.

### Purpose of the Scheme to Defraud

14. The purpose of the scheme to defraud was for **PERCIAVALLE, RUNKEL, ADAMS**, and others to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition and the performance of the LCS program in order to (a) maintain and increase the share price of Austal Limited's stock; and (b) unjustly enrich **PERCIAVALLE,**

5

**RUNKEL, ADAMS**, and others through the continued receipt of compensation, stock, and other benefits.

### Description of the Scheme to Defraud

*Concealment of Negative Performance and Rising Costs on the LCS Program*

15.     In or around late 2012 and early 2013, the LCS Program Material Manager, who was responsible for calculating the LCS non-labor EACs, discovered millions of dollars in non-labor cost growth on each LCS vessel. The LCS Program Material Manager reported this cost growth to **RUNKEL, ADAMS**, and others.

16.     By in or around mid- to late 2013, **PERCIAVALLE, RUNKEL, ADAMS**, and others knew that millions of dollars in additional non-labor costs would likely occur on multiple LCS vessels. Throughout the rest of 2013, **PERCIAVALLE, RUNKEL, ADAMS**, and others knew that the non-labor costs on the LCS vessels continued to rise despite efforts to control them.

17.     Instead of disclosing the true extent of the rising LCS non-labor costs, **PERCIAVALLE, RUNKEL, ADAMS**, and others directed Austal USA employees working on the LCS program to improperly report suppressed and fictitious non-labor EAC numbers. **PERCIAVALLE, RUNKEL, ADAMS**, and others used what they called a "program challenge"—a figure in the accounting records disguised as a cost-savings goal—to reduce the EACs to levels that would conceal the rising costs for materials and subcontracts on the LCS program. In reality, the "program challenge" was used as a plug number and a fraudulent device to hide growing costs that should have been incorporated into Austal USA's financial statements. This use of false and misleading "program challenge" entries in Austal USA's financial records had the effect of offsetting growing costs and thus artificially lowering Austal USA's EACs,

thereby causing Austal USA and Austal Limited to falsely report inflated earnings from the LCS program and conceal negative information about Austal USA's performance on the LCS program.

18. Throughout in or around 2014 and 2015, the "program challenge" offsets applied to non-labor EACs for multiple LCS vessels continued to grow in order to offset rising costs on those vessels. **PERCIAVALLE, RUNKEL, ADAMS**, and others continued to use program challenges to fraudulently suppress the EACs in order to conceal the true extent of the non-labor cost growth and negative performance issues on the LCS program from Austal Limited's shareholders, the investing public, Accounting Firm 1, and members of the Austal USA Board.

19. By at least in or around 2014, **PERCIAVALLE, RUNKEL, ADAMS**, and others also became aware of growing labor costs to complete LCS vessels. It became increasingly apparent that the ships would take more effort and time to build than originally budgeted, which caused labor costs to grow significantly. **PERCIAVALLE, RUNKEL, ADAMS**, and others knew that it would take significantly more labor hours than budgeted to build a number of LCS vessels, but they fraudulently suppressed the EACs for the labor costs on those vessels. Despite knowing about the growing labor costs, **PERCIAVALLE, RUNKEL**, and **ADAMS** fraudulently suppressed the labor EACs for LCS vessels to values that concealed the extent of the labor cost growth and negative performance issues from Austal Limited's shareholders, the investing public, Accounting Firm 1, and members of the Austal USA Board.

20. Through their actions, **PERCIAVALLE, RUNKEL**, and **ADAMS** improperly provided and caused to be provided false and misleading information about Austal USA's performance on the LCS program, including rising non-labor and labor costs in the program, to Austal Limited's shareholders, the investing public, Accounting Firm 1, and members of the Austal USA Board.

7

### *False and Misleading Statements to Accounting Firm 1*

21. One of the means used by **PERCIAVALLE, RUNKEL, ADAMS**, and others to conceal the negative performance issues and cost growth on the LCS program was to mislead and deceive Accounting Firm 1 during its audits and reviews of Austal USA's financial statements, which **PERCIAVALLE, RUNKEL, ADAMS**, and others knew were used to prepare Austal Limited's financial statements and other documents on which shareholders and the investing public relied.

22. For example, on or about June 18, 2014, **ADAMS** and **RUNKEL** met with Accounting Firm 1 to discuss the LCS program as part of the annual audit of Austal USA's financial statements. In connection with this meeting, **ADAMS** and **RUNKEL** prepared a Contract Analysis Questionnaire. The Questionnaire contained LCS EACs that **ADAMS** and **RUNKEL** knew were artificially suppressed and did not reflect management's best estimates. **ADAMS** and **RUNKEL** knowingly and intentionally provided false and misleading answers to questions from Accounting Firm 1 in order to conceal the extent of Austal USA's poor performance on the LCS program and the rising costs to build the LCS vessels.

23. Also, on or about August 15, 2014, **PERCIAVALLE** knowingly and intentionally signed a management representation letter addressed to Accounting Firm 1 that falsely stated, "All contract related estimates represent management's best estimate as of June 30, 2014." The letter also contained the following false representations, among others:

- "We have provided you with [a]ccess to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements such as records, documentation and other matters[.]"

- "We have no knowledge of any fraud or suspected fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting. In addition, we have no knowledge of any fraud or suspected fraud involving other employees where the fraud could have a material effect on the Reporting Package."

8

24. On or about July 23, 2015, **ADAMS** and **RUNKEL** again met with Accounting Firm 1 to discuss the LCS program as part of the annual audit of Austal USA's financials. In connection with this meeting, **ADAMS, RUNKEL,** and others prepared, and **ADAMS** signed, a Contract Analysis Questionnaire. The Questionnaire contained LCS EACs that **ADAMS** and **RUNKEL** knew were artificially suppressed and did not reflect management's best estimates. **ADAMS** and **RUNKEL** knowingly and intentionally provided false and misleading answers to questions from Accounting Firm 1 in order to conceal the extent of Austal USA's poor performance on the LCS program and the rising costs to build the LCS vessels.

25. On or about August 24, 2015, **PERCIAVALLE** signed a management representation letter addressed to Accounting Firm 1 that falsely stated, "All contract related estimates represent management's best estimate as of June 30, 2015." The letter also contained the following false representations, among others:

- "We have provided you with [a]ccess to all information, of which we are aware, that is relevant to the preparation and fair presentation of the Management Accounts such as records, documentation and other matters[.]"

- "We have no knowledge of any fraud or suspected fraud involving management or other employees who have a significant role in the entity's internal controls over financial reporting. In addition, we have no knowledge of any fraud or suspected fraud involving other employees in which the fraud could have a material effect on the Management Accounts."

26. Austal USA's management was also required to sign management representation letters in connection with half-yearly reviews done by Accounting Firm 1. For example, on or about February 19, 2016, **PERCIAVALLE** signed a management representation letter addressed to Accounting Firm 1 that falsely stated, "All contract related estimates represent management's best estimate as of December 31, 2015." The letter also contained the following false representations, among others:

- "We have provided you with [a]ccess to all information, of which we are aware, that is relevant to the preparation and fair presentation of the interim financial reporting package such as records, documentation and other matters[.]"

- "We have no knowledge of any fraud or suspected fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting. In addition, we have no knowledge of any fraud or suspected fraud involving other employees where the fraud could have a material effect on the interim financial reporting package."

27. **PERCIAVALLE, RUNKEL,** and **ADAMS** knew these representations were false at the time **PERCIAVALLE** signed the management representation letters and at the time **RUNKEL** and **ADAMS** submitted the Contract Analysis Questionnaires to Accounting Firm 1.

### *Causing False and Misleading Information to be Released to Shareholders and the Investing Public*

28. By concealing negative information about Austal USA's performance and the extent of the cost growth on the LCS program from members of the Austal USA Board and Accounting Firm 1, **PERCIAVALLE, RUNKEL, ADAMS,** and others knowingly and intentionally caused Austal Limited to communicate false and misleading information to Austal Limited's shareholders and to the investing public in Austal Limited's required annual and semi-annual financial reporting.

29. For example, on or about August 27, 2014, **PERCIAVALLE, RUNKEL, ADAMS,** and others caused Austal Limited to file false and misleading information in an ASX Appendix 4E for the year ending on June 30, 2014. Among other things, **PERCIAVALLE, RUNKEL, ADAMS,** and others caused Austal Limited to falsely overstate its earnings by millions of dollars by using artificially suppressed EACs for certain LCS vessels in the Austal USA financial statements.

30. Also, on or about August 26, 2015, **PERCIAVALLE, RUNKEL, ADAMS,** and others caused Austal Limited to file false and misleading information in an ASX Appendix 4E for

10

the year ending on June 30, 2015. Among other things, **PERCIAVALLE, RUNKEL, ADAMS,** and others caused Austal Limited to falsely overstate its earnings by millions of dollars by using artificially suppressed EACs for certain LCS vessels in the Austal USA financial statements.

31. On or about December 10, 2015, Austal Limited released a "US Shipbuilding Progress Update" to investors, stating that "FY2016 earnings from Austal's US shipyard are expected to be lower than in FY2015, with US shipbuilding EBIT margin expected to be in the range of 4.5% to 6.5%." The company attributed lowered earnings to the LCS program, namely that "Austal's ability to apply lessons learnt and productivity enhancements from LCS 6 to vessels in advanced construction, namely LCS 8 and LCS 10, has been more limited than anticipated." This announcement revealed previously undisclosed information about performance issues on the LCS program, but it did not reveal the true extent of performance issues and cost growth on the program. As a result of this announcement, the share price of Austal Limited's stock was significantly negatively impacted.

32. On or about July 4, 2016, Austal Limited reported that it expected to record a significant EBIT (Earnings Before Interest and Taxes) loss in fiscal year 2016, which the company primarily attributed to a "US$115 million . . . one off write back of work in progress . . . required to recognise an increase in the cost of construction" of the LCS ships. Austal Limited reported that this change of estimate was determined following "an extensive review of the LCS program." The change in estimate meant that "too much revenue and profit was attributed to work already completed." Again, as a result of this announcement, the share price of Austal Limited's stock was significantly negatively impacted.

33. In the December 10, 2015 and July 4, 2016 announcements, Austal Limited did not attribute the adjustments to an effort to correct past misstatements of the LCS EACs. Austal

Limited did not disclose the fact that **PERCIAVALLE, RUNKEL, ADAMS,** and others knew about the performance issues and cost growth well before the announcements but concealed that information so that it was not previously reported to Austal Limited's shareholders and the investing public.

### *Banks 1 and 2 Received Financial Statements Containing False Information About Austal USA's Financial Condition*

34. While the purpose of the scheme was to defraud shareholders and the investing public, it also affected financial institutions, including Bank 1 and Bank 2. In or around October 2015, Austal Limited entered into a syndicated facility agreement (SFA) for approximately $105 million with Bank 1 and Bank 2. Austal Limited entered into the SFA with Bank 1 and Bank 2 to finance construction at Austal USA's shipyard in Mobile, Alabama, among other purposes.

35. As part of the agreement between Austal Limited and the banks, Austal Limited agreed to follow certain terms designed to limit the risk borne by the banks. These terms were known as "financial covenants." Prior to entering the SFA, Austal Limited was required to report certain financial figures to the banks so the banks could make reasonable determinations with regard to the level of credit risk and the fees to be charged in connection with the SFA. After entering the SFA, Austal Limited was required to periodically report financial information to the banks to show it remained in compliance with the covenants. The SFA included a "[n]o misleading information" clause that provided, in part, that "[a]ny factual information provided by or on behalf of" Austal Limited "was true and accurate in all material respects and not misleading as at the date it was provided[.]"

36. Prior to entering into the SFA, Bank 1 and Bank 2 were provided with Austal USA's and Austal Limited's financial statements for fiscal years 2014 and 2015. In signing the

SFA, an executive from Austal Limited agreed that all information provided as part of the agreement was accurate and truthful.

37. **PERCIAVALLE, RUNKEL, ADAMS,** and others caused Austal Limited to provide financial statements to Bank 1 and Bank 2 for fiscal years 2014 and 2015 that falsely overstated Austal USA's and Austal Limited's earnings by millions of dollars by using artificially suppressed EACs for the LCS program.

38. Bank 1 and Bank 2 were financial institutions within the definition of Title 18, United States Code, Section 20.

### COUNT 1
**Conspiracy to Commit Wire Fraud and Wire Fraud Affecting a Financial Institution**
**(18 U.S.C. § 1349)**

39. The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 11 of this Indictment as though fully set forth herein.

40. From at least in or around 2013 through at least in or around August 2016, the exact dates being unknown to the Grand Jury, in the Southern District of Alabama and elsewhere, the defendants,

**CRAIG D. PERCIAVALLE,**
**JOSEPH A. RUNKEL, and**
**WILLIAM O. ADAMS,**

did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with other individuals known and unknown, to commit certain offenses, namely:

a. wire fraud, that is, to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit

13

and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

b. wire fraud affecting a financial institution, that is, to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, and in doing so affected a financial institution, in violation of Title 18, United States Code, Section 1343.

### Overview of the Conspiracy

41. The Grand Jury realleges and incorporates by reference paragraphs 12 and 13 of this Indictment as a description of the overview of conspiracy.

### Purposes of the Conspiracy

42. The Grand Jury realleges and incorporates by reference paragraph 14 of this Indictment as a description of the purposes of the conspiracy.

### Manner and Means of the Conspiracy

43. The Grand Jury realleges and incorporates by reference paragraphs 15 through 38 of this Indictment as a description of the manner and means of the conspiracy.

All of which is in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
## Wire Fraud
## Title 18, United States Code, Sections 1343 and 2(a)

44. The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 11 of this Indictment as though fully set forth herein.

45. From at least in or around 2013 through at least in or around August 2016, the exact dates being unknown to the Grand Jury, in the Southern District of Alabama and elsewhere, the defendants,

**CRAIG D. PERCIAVALLE,**
**JOSEPH A. RUNKEL, and**
**WILLIAM O. ADAMS,**

did knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

### Overview of the Scheme and Artifice

46. The Grand Jury realleges and incorporates by reference paragraphs 12 and 13 of this Indictment as a description of the overview of the scheme and artifice.

### Purposes of the Scheme and Artifice

47. The Grand Jury realleges and incorporates by reference paragraph 14 of this Indictment as a description of the purposes of the scheme and artifice.

## Manner and Means of the Scheme and Artifice

48. The Grand Jury realleges and incorporates by reference paragraphs 15 through 38 of this Indictment as a description of the manner and means of the scheme and artifice.

## Use of the Wires

49. On or about the dates specified as to each count below, the defendants,

**CRAIG D. PERCIAVALLE,**
**JOSEPH A. RUNKEL, and**
**WILLIAM O. ADAMS,**

in the Southern District of Alabama and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce, as set forth below:

| Count | Approximate Date | Description of Interstate Wire |
|---|---|---|
| 2 | April 17, 2015 | Email from CC-1 "on behalf of" **PERCIAVALLE** to Austal USA Board of Directors containing artificially suppressed LCS Program EACs |
| 3 | July 22, 2015 | Transmission of Austal USA Financial Statements to Austal Limited in Australia |
| 4 | July 29, 2015 | Email from Austal USA employee to Accounting Firm 1 transmitting LCS Program Contract Analysis Questionnaire prepared by **RUNKEL**, **ADAMS**, and others |

16

| Count | Approximate Date | Description of Interstate Wire |
|---|---|---|
| 5 | August 25, 2015 | Email from CC-1 to Accounting Firm 1 transmitting management representation letter signed by **PERCIAVALLE** and CC-1 |
| 6 | February 19, 2016 | Email from Austal USA employee to Accounting Firm 1 transmitting management representation letter signed by **PERCIAVALLE** and CC-1 |

Each count of which is a separate violation of Title 18, United States Code, Sections 1343 and 2(a).

### COUNTS 7-8
### Wire Fraud Affecting a Financial Institution
### Title 18, United States Code, Sections 1343 and 2(a)

50. The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 11 of this Indictment as though fully set forth herein.

51. From at least in or around 2013 and continuing until at least in or around August 2016, the exact dates being unknown to the Grand Jury, in the Southern District of Alabama, and elsewhere, the defendants,

**CRAIG D. PERCIAVALLE,**
**JOSEPH A. RUNKEL, and**
**WILLIAM O. ADAMS**

did knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of

17

wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and in doing so affected a financial institution.

### Overview of the Scheme and Artifice

52. The Grand Jury realleges and incorporates by reference paragraphs 12 and 13 of this Indictment as a description of the overview of the scheme and artifice.

### Purposes of the Scheme and Artifice

53. The Grand Jury realleges and incorporates by reference paragraph 14 of this Indictment as a description of the purpose of the scheme and artifice.

### Manner and Means of the Scheme and Artifice

54. The Grand Jury realleges and incorporates by reference paragraphs 15 through 38 of this Indictment as a description of the manner and means of the scheme and artifice.

### Use of the Wires

55. On or about the dates specified as to each count below, the defendants,

**CRAIG D. PERCIAVALLE,**
**JOSEPH A. RUNKEL, and**
**WILLIAM O. ADAMS**

in the Southern District of Alabama and elsewhere, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce, as set forth below:

| Count | Approximate Date | Description of Interstate Wire |
|---|---|---|
| 7 | July 29, 2014 | Email from **RUNKEL** to Accounting Firm 1 containing LCS Program Contract Analysis Questionnaire prepared by **RUNKEL** and **ADAMS** |
| 8 | August 18, 2014 | Email from CC-1 to Accounting Firm 1 transmitting management representation letter signed by **PERCIAVALLE** and CC-1 |

Each count of which is a separate violation of Title 18, United States Code, Sections 1343 and 2(a).

### FORFEITURE NOTICE
### Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)
### Title 28, United States Code, Section 2461(c)

The allegations in Paragraphs 1 through 55 of this Indictment are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c).

Upon conviction of the offenses set forth in Counts 1 through 8 of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the offenses.

If any of the forfeitable property, as a result of any act or omission of the defendants:

    A. cannot be located upon the exercise of due diligence;

    B. has been transferred or sold to, or deposited with, a third party;

    C. has been placed beyond the jurisdiction of the court;

D. has been substantially diminished in value; or

E. has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON UNITED STATES GRAND JURY
SOUTHERN DISTRICT OF ALABAMA

SEAN P. COSTELLO
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF, FRAUD SECTION

By:

CHRISTOPHER J. BODNAR
Assistant United States Attorney

KYLE HANKEY
Assistant Chief
CHRISTOPHER JACKSON
Acting Assistant Chief
LAURA CONNELLY
Trial Attorney

MARCH 2023