**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. 23-cr-00070-JB** |
| | * | |
| **CRAIG D. PERCIAVALLE** | * | |
| **JOSEPH A. RUNKEL** | * | |
| **WILLIAM O. ADAMS** | * | |

**UNITED STATES' OPPOSITION TO MOTION TO COMPEL**
**IDENTIFICATION OF *BRADY* INFORMATION**

The United States of America, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, and Lorinda I. Laryea, Chief of the Fraud Section, Criminal Division, Department of Justice, opposes defendants' motion to compel the identification of *Brady* information. Even in document-intensive cases, the United States is not required to take the extraordinary step to affirmatively create a log of *Brady* information for defendants. While the United States acknowledges that the volume of discovery in this fraud case is large, it has far exceeded its discovery obligations by taking substantial steps to ensure that defendants are aware of the key documents and issues that will animate its case-in-chief at trial and be material to the preparation of the defense. For the reasons stated below, the motion should be denied.

I.    Background

This case centers around a wire fraud conspiracy conducted by defendants Craig D. Perciavalle, Joseph A. Runkel, and William O. Adams (hereinafter "Perciavalle," "Runkel," and "Adams" or collectively "defendants"). The indictment alleges that, from in or around 2013 through in or around 2016, the defendants were executives at Austal USA, a contractor for the United States Navy and a subsidiary of Austal Limited, a publicly traded Australian company. While at Austal USA, defendants agreed and schemed to make and cause others to make false and misleading statements about Austal USA's financial performance on one of its Navy shipbuilding programs (the littoral

1

combat ship or LCS program) and about Austal USA's overall financial condition in order to defraud Austal Limited's shareholders and the investing public. [Doc. No. 1. at ¶ 12] Defendants did this by intentionally providing false and fraudulent financial information to Austal USA's Board of Directors, Austal USA's independent financial statement auditors, and Austal Limited for dissemination to Austal Limited's shareholders and the investing public. [*Id.* at ¶ 13] The scheme to defraud was done to mislead Austal Limited's shareholders and the investing public about Austal USA's financial condition in order to maintain and increase the share price of Austal Limited's stock (through the purchase of shares by shareholders and the investing public at artificially inflated prices) and unjustly enrich defendants and others through the continued receipt of compensation, stock, and other benefits. [*Id.* at ¶ 14].

**II.** **The United States' Extensive Efforts to Assist Defendants with Discovery Issues**

As the United States has articulated in many prior status hearings and filings, the United States has gone to extraordinary lengths to make discovery available and accessible to defendants. The defendants have had access to the most essential documents in the case for the better part of three years.

Immediately following this Court's entry of the protective order in this case on April 24, 2023, *see* [Doc. No. 35], the United States began making extensive efforts to provide prompt discovery and assist defendants with its review of that discovery. On April 25, 2023 and May 31, 2023, the prosecution team, in compliance with Rule 16 of the Federal Rules of Criminal Procedure, *Brady*, and the Court's April 12, 2023 Due Process Protection Act Order, [Doc. Nos. 17, 22, 27], made two productions to the defendants that — combined — contained over 15 million records.[1] Each production was accompanied by a cover letter and a detailed index with corresponding Bates numbers.

---

1   The United States filter team has also produced discovery to the defendants.

The United States produced these materials in an electronic, searchable format, with metadata, that was capable of being loaded into a discovery database for electronic review.   Not knowing all of the defendants' likely defenses or lines of cross-examination of the United States' witnesses at trial, the United States exercised caution and took an expansive approach to discovery that went well beyond the requirements of Rule 16 and *Brady*.

Given the voluminous discovery, the United States — on its own initiative — took additional steps beyond its ordinary process to assist in the defendant's review of the documents produced in those first two productions.   Along with Productions 1 and 2 in April and May 2023, the United States provided separate folders containing copies of the following key discovery materials in a format that could be reviewed without a discovery database[2]:

- A folder of "Indictment Documents" containing approximately 200 documents (also separately produced in the load-ready file) that relate to specific allegations and counts in the Indictment.

- A folder containing all the interview reports of witnesses interviewed, including interview reports of certain defendants.

- A folder of "Interview Report Documents" containing 1,501 documents (also separately produced in the load-ready file) that are referenced in the interview reports.

- A folder containing the full NCIS and DCIS case files, which were updated by the case agents throughout the investigation with relevant investigative steps and activities.

All of these materials were provided in review-ready format, i.e., not requiring the use of any special technology beyond Adobe Acrobat to review the information.   This could have allowed defendants to review key evidence, including all Reports of Interview for key witnesses and their corresponding documents as well as the investigative files, even before hiring an e-discovery vendor were resolved in September 2023.

In addition, along with its first production, the United States provided a file that identified

---

2      This was especially helpful to defendants, as over the summer of 2023, defendants represented that they could not hire an e-discovery vendor because of issues related to their insurance provider.

approximately 35,000 of the documents that had been produced which the prosecution team had identified as among the most relevant to the United States' investigation to-date and, therefore, marked as "hot" in the United States' database. The United States also identified the approximately 200,000 documents that the United States had marked as responsive to a search warrant that had been executed at Austal USA's headquarters.

The United States production of discovery was overinclusive — for example, the United States obtained consent from Austal USA to provide **all** the materials seized during the search warrant despite the fact that the United States had only designated approximately 200,000 of the documents as responsive to the search warrant. In producing the warrant materials, the United States also distinguished between electronic materials and the materials that were collected in paper form and then scanned, using different Bates stamps for the different types of materials. Given the volume, the United States attempted to cull some of the irrelevant discovery. For example, the United States ran search terms over email data collected from the U.S. Navy (that spanned back to 1997) during the investigation and turned over only the documents that hit on the terms in the first production. When defendants requested all of the U.S. Navy email data, the United States complied, but the request added approximately two million additional documents (amounting to roughly three million pages) to the discovery produced to defendants even though the additional documents likely have no relevance to the case. The United States also informed defendants that it was in possession of a laptop and cell phone of the former Commanding Officer of SUPSHIP, but that the devices had never been processed by the prosecution team and were likely irrelevant. On defendants' request, the United States again produced these materials, despite the fact that they likely are not relevant to the charges in the Indictment.

Since these initial productions of discovery, the United States has continued to provide discovery that it receives in load-ready, searchable formats along with detailed indices. The United States has also met and conferred with defendants and accommodated a significant number of defense

4

requests throughout this process:

- The United States reproduced the "Interview Report Documents" in folders corresponding to each interview report with the referenced document therein to allow the defendants to more easily access and locate each document that was reviewed with the witness.

- In July 2023, in response to a defense request made because of the lack of an electronic review platform, the United States separately re-produced the documents previously identified as deemed "hot" and responsive to the Austal USA search warrant so that the defendants could load those documents into an electronic review platform and review them without loading the balance of materials produced in discovery. The United States updated this production to include newly tagged documents in the intervening period.

- The United States produced grand jury transcripts early, along with grand jury exhibits used with the witnesses.

- The United States produced search warrant affidavits, despite being under no legal obligation to do so pursuant to *Brady*, *Giglio*, Rule 16, or the Jencks Act.

- In April 2024, the United States provided defendants with its internal "issue coding" related to approximately 30 "issue tags" related to the allegations in the Indictment. These issue tags were tags the United States used to identify documents that related to issues in the case, such as "Accounting – Materials Growth," "Accounting – Materials Challenges," "Accounting – Risk Process," and "Accounting – Shock." The production of this coding provides defendants with the internal, deliberative work product of the United States in an effort to help in the review.

- The United States reproduced a collection of documents related to the Austal USA Board from the scheme period.

- The United States identified the Bates prefixes for the documents collected from each of defendants' offices.

The United States also offered to set an early exchange of exhibit lists with a pretrial procedure to try and stipulate to the preadmission of exhibits and resolve objections, which has not been accepted by defendants.

In addition to the disclosure of certain work product of the United States, the United States also previewed the case against each defendant for their respective counsel. The United States provided a fulsome, four-hour reverse proffer to Perciavalle in December 2023, walking his counsel through the evidence against him. Prior to the indictment being returned in this matter, the United States provided similarly detailed walk-throughs of information learned in its investigation to counsel for both Adams and Runkel, explaining its understanding of key concepts and documents. Adams

5

ultimately proffered with the United States on two separate occasions in February 2021 and October 2022, and Runkel proffered with the United States on five separate occasions starting in 2019. The United States also provided a significant number of documents to counsel for Runkel and Adams before indictment, including allowing Runkel the opportunity to review documents in its internal database in order to identify the important documents he would have used that would be relevant to the investigation.   As the case has progressed, the United States has also made every effort to work with defendants as technical issues have arisen.

III.        **The Law Does Not Require the United States to Prepare a List of All Potential *Brady* or *Giglio* Information**

The United States acknowledges its constitutional obligations to disclose exculpatory information and impeachment evidence, and it has complied with the Court's orders ensuring that it will do so.   *Brady v. Maryland*, 373 U.S. 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); Fed. R. Crim. P. 5(f); [Doc. # 17, 22, 27].

To establish a *Brady* violation, a defendant must show: (1) the government possessed evidence favorable to the defendant; (2) the defendant did not possess the evidence and could not obtain it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material.   *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001).   Defendants cannot make out a cognizable *Brady* claim for numerous reasons, as they concede.   *See* Defs.' Mot. [Doc. # 199] at 4-5 ("The defendants are not arguing in this pretrial motion that a failure by the government to specifically identify *Brady* material necessarily constitutes a *Brady* violation.").

Instead, defendants attempt to expand the United States' *Brady* obligations by appealing to notions of "fairness," and by seeking to require the United States to catalogue any evidence that it believes could constitute *Brady* or *Giglio* information among the already-disclosed evidence. Defendants have raised this complaint before in numerous status conferences, and the United States and the Court have engaged in numerous colloquies about the issue.   This motion follows, and it

6

should be rejected for all of the reasons that the United States has articulated in the past.

No court of appeals has ever required the United States to do what defendants ask. To the contrary, the argument that the United States has a duty to itemize potential *Brady* evidence has been raised and squarely rejected by every court of appeals to have considered this issue, including the Court of Appeals for the Second, Third, Fourth, Fifth, Sixth, Seventh, and Ninth Circuits.[3]

"*Brady* and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed." *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005); *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) (collecting cases) (the government "is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence"), *vacated in part on other grounds*, 561 U.S. 358 (2010); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86-87 (2d Cir. 2018) (agreeing with *Skilling*); *United States v. Yi*, 791 F. App'x 437, 438 (4th Cir. 2020) (per curiam) (rejecting the argument that the government's *Brady* obligation extends to identifying exculpatory material within its produced discovery);

In *Skilling*, a case where the government produced discovery far more voluminous than in this case, the Fifth Circuit concluded that no discovery violation occurred:

> [T]he government did much more than drop several hundred million pages on [the defendant's] doorstep. The open file was electronic and searchable. The government produced a set of "hot documents" that it thought were important to its case or were potentially relevant to [the defendant's] defense. The government created indices to these and other documents . . . [The defendant] contends that the government should

---

3     Defendants cite cases regarding "open file" discovery policies, but those cases are largely inapposite. The United States has, without question, taken an expansive view of its discovery obligations in this case. But a true "open file" discovery policy would permit a defendant direct access to the United States' case file, which defendants do not have here. Thus, defendants' reliance on *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 828 (10th Cir. 1995), an open file discovery case, is misplaced. *See* Defs.' Mot. at 4-5. In that case, in response to a specific defense request for "all police reports," the state prosecutor's office "made available for review" its entire case file. It was later determined that a material police report was missing from the prosecutor's file. The Court, appropriately, found a *Brady* violation, because the prosecutor was obligated to search not only his own file, but those of his agents as well. But that case, as with the other "open file" cases cited by defendants, bears no relation to this case.

have scoured the open file in search of exculpatory information to provide to him. Yet the government was in no better position to locate any potentially exculpatory evidence than was Skilling.

554 F.3d at 577.[4]   Thus, when the government produces well-organized, searchable discovery—even voluminous discovery—it is not "obliged to sift fastidiously" through it or "direct a defendant to exculpatory evidence" within it.   *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) (first quoting *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010); then quoting *Skilling*, 554 F.3d at 576); *see also Rhoades v. Henry*, 638 F.3d 1027, 1039 & n.12 (9th Cir. 2011) (holding in a habeas case that prosecution was under no obligation to point defendants to a particular segment of a disclosed recorded statement which contained exculpatory evidence).[5]

Numerous district courts have adhered to this precedent and rejected claims that the United States must itemize exculpatory and impeachment information for the defendant.   *See e.g.*, *United States v. Ellis*, No. 2:19-CR-693, 2020 WL 3962288, at *2 (D.N.J. July 13, 2020) (rejecting defendant's argument that United States had "affirmative obligation to find exculpatory material" among disclosed discovery, and concluding it "satisfied its disclosure obligation under *Brady* and has gone further than the requirements of [Rule 16]" by organizing the discovery, providing an index and Bates stamps, providing records in the same format as received from third parties, and "provid[ing], whenever possible, electronic records in a searchable format"); *United States v. McGill*, No. 12-112-01, 2016 WL 48214 at *9 (E.D. Pa. Jan. 5, 2016) (applying *Pelullo* and denying defendant's motion to specifically identify *Brady* and *Giglio* in "voluminous" discovery where (1) the discovery could be loaded to an

---

4       Defendants attempt to distinguish *Skilling* and other of the circuit decisions by pointing out that they arose in the context of post-trial *Brady* litigation.   Defs.' Mot. at 13-14.   But that makes sense because as the defendants concede, they are not bringing a traditional *Brady* claim.

5       It also bears noting that the *Skilling* case involved "several hundred million" pages of records while this case involves roughly 49 million pages – a difference of an order of magnitude.   In *Warshak*, there were at least 17 million pages of electronic records, plus another 400,000 pages of hard-copy records at issue.   631 F.3d at 295.   *Pelullo* involved 75,000 pounds of hard copy documents.   399 F.3d at 204.   The volume of documents in this case, while large, is at least comparable to those cases.

electronic database and searched; (2) the United States provided a discovery log; (3) defendant was not detained; and (4) defendant did not allege bad faith conduct on part of government); *United States v. Beam*, No. 1:10-CR-047, 2015 WL 2356755 at *6-7 (M.D. Pa. May 15, 2015), *aff'd*, 635 F. App'x 28 (3d Cir. 2015) (applying *Pelullo* and concluding the government did not violate its obligations under *Brady*); *see also United States v. Parks*, No. 18-CR-0251, 2019 WL 4979838, at *3 (N.D. Okla. Oct. 8, 2019) (denying motion to compel government to "identify potentially exculpatory evidence that is included in the discovery materials" because, "defendants have not shown that *Brady* or *Giglio* requires more than the production of potentially exculpatory evidence"); *United States v. AU Optronics Corp.*, No. 09-CR-0110, 2011 WL 6778520 at *2 (N.D. Cal. Dec. 23, 2011) (finding defendants were "well-resourced" and denying motion to compel government to identify *Brady* material within 37 million pages of documents produced in discovery); *United States v. Ohle*, No. 08-CR-1109, 2011 WL 651849 at *4 (S.D.N.Y. Feb. 7, 2011) (reiterating that "as a general rule, the Government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence," particularly where the government provides the defense with a "searchable . . . database," because "the defendants were just as likely to uncover the purportedly exculpatory evidence as was the Government"); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 825 F. Supp. 2d 451, 454 (S.D.N.Y. 2011) (denying defendant's motion "because "The Court finds that *Brady* and its progeny impose no obligation on the Government to organize for Defendants in the format they design material already provided to them."); *United States v. Ferguson*, 478 F. Supp. 2d 220, 241-42 (D. Conn. 2007) (denying motion to identify "*Brady* and *Giglio* materials already produced" because government provided discovery in searchable format and "hot docs" at arraignment); *United States v. Meek*, No. 1:19-CR-00378, 2021 WL 1049773, *14-19 (S.D. Ind. Mar. 19, 2021) (denying defendants' motions to compel government to identify *Brady* material in complex, document-intensive fraud case, noting defendants were sophisticated executives with experienced counsel).

IV.        **The Cases Cited by Defendants Are Distinguishable**

Defendants rely on a series of cases that are distinguishable from the authority cited above. The defendant argues that these cases should compel the Court to require the United States to specifically identify *Brady* and *Giglio* information within the discovery already produced, but each of defendants' cited cases is inapt and unpersuasive here.

As a threshold matter, both of the district courts in *United States v. Salyer*, No. 10-0061, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010), and *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020), cited by the defendants, held that exceptional circumstances of each defendant—not present in this case—were key factors that favored requiring specific identification of *Brady* and *Giglio*.   In *Salyer*, the district court found:

> [T]here is a singular, individual defendant, who is detained in jail pending trial, and who is represented by a relatively small defense team.  There is no parallel civil litigation, and [the defendant] does not have access to voluntary corporate assistance in attempting to find the documents needed by the defense.   [The defendant] has little practical ability in the jail setting to be of much assistance in the search as he can do no document review, either hard copy or electronically, absent the physical presence of counsel in the jail.

*Salyer*, 2010 WL 3036444 at *7.   In *Saffarinia*, the court found such factors similarly persuasive:

> As the present case closely resembles *Salyer*, the Court reaches the same outcome. Like the defendant in *Salyer*, [the defendant in this case] is an individual defendant who neither has the benefit of parallel civil litigation, nor access to voluntary corporate assistance to sift through the massive amounts of documents within the government's voluminous production.   The defendant in *Salyer* was represented by a relatively small defense team, and [the *Saffarinia* defendant's] counsel is handling this matter *pro bono* with time constraints and limited financial resources.

424 F. Supp. 3d at 88 (cleaned up).

In this case, the circumstances differ in nearly every relevant respect from those of the defendants in *Salyer* and *Saffarinia*: (1) the defendants are not "in jail pending trial" but on pretrial release, where they have the full practical ability to assist in the review of documents; (2) the defendants are not "represented by a relatively small defense team[s]" who are "handling this matter *pro bono*" but by retained, experienced local counsel and large international law firms with significant

10

resources and numerous partners and associate attorneys staffed on the matter; (3) the defendants are sophisticated, well-educated former executives of a publicly traded company; (4) the defendants have filed numerous motions and lengthy briefs, which is of course their right, but speaks to the sophistication of their representation, *see Warshak*, 631 F.3d at 298; and (5) the defendants have had access to the documents for the better part of three years, in the same user-friendly, searchable, indexed format as the Government. Because the defendants' circumstances are so significantly different than those in *Salyer* and *Saffarinia*, those exceptional cases do not counsel any departure from the standard that the United States has already satisfied here.

Moreover, it bears repeating that the discovery produced in each of the defendants' cited cases was provided in a less accessible format than the discovery produced here—which was organized, searchable, and indexed to facilitate the defendant's review. In *United States v. Blankenship*, No. 5:14-CR-00244, 2015 WL 3687864 (S.D.W. Va. June 12, 2015), for example, the district court noted that the "unorganized" discovery and "deficiencies in the electronic characteristics of the documents limit the defense's ability to effectively" use them and that the defense "accuse[d] the United States of hiding any exculpatory *Brady* in the four million pages of discovery." *Id.* at *3 (internal quotations omitted). In requiring the United States to specifically identify *Brady* and *Giglio*, the court distinguished *Skilling* because the "[*Skilling*] decision turned largely on additional steps taken by the Government" that were lacking in *Blankenship*. *Id.* at *6. *Blankenship* is inapt in this case precisely because the United States has exceeded the *Skilling* standard. Similarly misplaced is the defendant's reliance on *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), where, unlike here, the United States did not include an index to the voluminous paper-based discovery provided. *See id.* at 28 (noting that the government had produced simply a "mass of paper").

District courts analyzing similar motions based on the same cases that defendants cite have rightly concluded that when the government provides fulsome, well-organized discovery and facilitates the defendant's review of it—as the United States has done here—motions to specifically identify

11

*Brady* and *Giglio* should be denied. *See, e.g., Meek*, 2021 WL 1049773, at \*2 (analyzing *Skilling, Saffarinia, Blankenship, Salyer, Hsia,* and other cases, and denying motion to compel the United States to specifically identify *Brady* and *Giglio*); *Rubin/Chambers*, 825 F. Supp. 2d at 454-57 (distinguishing *Salyer*, citing *Skilling*, and finding "no reason to doubt that the Government has provided Defendants with access to all potential *Brady* material and has taken additional steps to facilitate the Defendants' review of that material. *Brady* and its progeny require no more."); *United States v. Weaver*, 992 F. Supp. 2d 152, 154-57 (E.D.N.Y. 2014) (distinguishing *Salyer* and *Hsia*, citing *Skilling*, and holding that "[w]hile the Supreme Court in *Brady* held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case") (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990)).

The principles guiding these decisions apply equally here. In this case, the United States' productions have been well organized, it has taken significant additional steps to facilitate defendants' ability to meaningfully use the discovery to prepare for trial, and there has been no claim—nor could there be—that the government is acting in bad faith by hiding exculpatory material in the voluminous discovery or knowingly withholding it.[6] As the non-controlling cases cited by defendants are readily distinguishable and no exception to the general standard applies, defendants' motion for itemized *Brady* and *Giglio* material should be denied.

---

6        Defendants argue that the indices are "only marginally helpful," pointing to the fact that 11.4 million of the documents are described only as "Records from the Austal USA Search Warrant." Def's Mot. at 8. This ignores the steps that the United States has taken to help defendants identify what is most relevant in the search warrant materials. As noted above, the warrant materials that are electronic are distinguished from the paper records through Bates stamps. And, more importantly, the United States identified the materials that were deemed "responsive" to the warrant for defendants. Had the United States not taken the extraordinary step of obtaining consent from Austal USA to produce the non-responsive <u>and</u> potentially privileged records to defendants in order to ensure they had access to anything they might deem relevant to preparing their defense, defendants would have been entitled only to the approximately 200,000 documents that the United States collected as part of its search warrant review. Instead, the United States opted to provide defendants with more.

12

Defendants further cite "numerous technical issues with the government's productions" as a reason to grant its motion. Defs.' Mot. at 8. Defendants concede that it has "raised technical issues with the government as it has come upon them, or attempted to resolve them itself, but some issues remain." *Id.* That is a far cry from the cases cited by defendants, where technical problems "seriously impede[d]" the defense review effort. *See id.* (quoting *United States v. Cutting*, No. 14-cr-139, 2017 WL 132403 at *10   (N.D. Cal. Jan. 12, 2017) *and United States v. Omidi,* Case No. 17-cr-661, 2021 WL 7629896, at *2 (C.D. Cal. Sept. 1, 2021)). In *Cutting*, the government's production included issues such as the searchable text not matching the images of the documents, emails that were missing attachments, producing multiple unrelated documents together as a single document, and multipage documents produced as single-page documents. *Id.* at *5; *see also Omidi*, 2021 WL 7629896 at *2 (citing counsel's "repeated representations of difficulties searching the Government's electronic discovery database"). To the extent defendants have raised technical issues, the United States has endeavored to immediately solve them. And to the extent any issues remain, the United States is unaware of them. Defendants have always been encouraged to raise technical issues with the United States, and the United States will continue to work in good faith with its technical team to fix any issues presented. But the inevitable discovery of a small percentage of documents with technical problems is not a reason to depart from the general rule as articulated by the majority of the circuit courts.[7]

## V.    Conclusion

For all of those reasons, the Court should deny the motion.

---

[7]    Many of the technical issues raised by defendants related to an issue with the re-production of documents the United States made in the summer of 2023 in an effort to assist defendants in reviewing discovery while they resolved their issues with retaining counsel and an e-discovery vendor. In addition, many issues defendants have identified have related to "gaps" in productions that are either not gaps at all or intentional gaps in the production numbers. Far from presenting a serious impediment to defendants' review, these issues have been resolved in a timely manner and have pertained to productions of documents that were intended to go above and beyond what was required in discovery.

Respectfully submitted this 13th day of May 2026.

SEAN P. COSTELLO
UNITED STATES ATTORNEY

LORINDA I. LARYEA
CHIEF, FRAUD SECTION

By: /s/ *Joshua D. Rothman*
Laura Connelly, Acting Assistant Chief
Joshua D. Rothman, Trial Attorney
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: (202) 880-0257

By: /s/ *Christopher J. Bodnar*
Christopher J. Bodnar
Assistant United States Attorney
United States Attorney's Office for the
Southern District of Alabama
60 South Royal Street, Suite 600
Mobile, Alabama 36602