IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CRIMINAL NO. CR23-00070 |
| | ) COURTROOM 4A |
| | ) U.S. FEDERAL COURTHOUSE |
| | ) MOBILE, ALABAMA |
| VS. | ) AUGUST 20, 2025 |
| | ) PAGES 1 TO 40, INCLUSIVE |
| CRAIG D. PERCIAVALLE; | ) |
| JOSEPH A. RUNKEL; | ) |
| WILLIAM O. ADAMS, | ) |
| DEFENDANTS. | ) |

MOTION HEARING
BEFORE THE HONORABLE JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
Department of Justice
By: Laura Connelly, Esq.
By: Robert Spencer Ryan, Esq.
1400 New York Avenue NW
Washington, D.C. 20005

FOR DEFENDANT CRAIG T. PERCIAVALLE:

Bradley Arant Boult Cummings
By: Jack W. Selden, Esq.
1819 5th Avenue North
Birmingham, Alabama 35223

Bradley Arant Boult Cummings
By: Erin Kathleen Sullivan, Esq.
By: Gregory Marshall, Esq.
1900 K Street NW
Washington, D.C. 20006

APPEARANCES, CONTINUED:

FOR DEFENDANT JOSEPH A. RUNKEL:

Dentons Sirote PC
By: James R. Sturdivant, Esq.
By: Alyse Nicole Windsor, Esq.
By: Robert R. Baugh, Esq.
2311 Highland Avenue South, Suite 500
Birmingham, Alabama 35205

FOR DEFENDANT WILLIAM O. ADAMS:

Jones Walker, LLP
By: Frederick George Helmsing, Jr., Esq.
By: Thomas Hart Benton, III, Esq.
11 North Water Street, Suite 1200
Mobile, Alabama 36602

Jones Walker, LLP
By: Avery B. Pardee, Esq.
201 St. Charles Street, Floor 51
New Orleans, Louisiana 70170

COURTROOM DEPUTY: Melanie Paulk

COURT REPORTER: Melanie Wilkins, RMR, CRR
Official Court Reporter

Proceedings reported by machine stenography.

Transcript produced by computer.

[August 20, 2025, 1:03 p.m.]

THE CLERK: Case set for a motion hearing in Criminal Action 23-70, United States of America versus Perciavalle, et al.

Counsel, we'll start with this table to my left. Will you identify yourself and the client you represent, please, for the record.

MR. PARDEE: Avery Pardee on behalf of Bill Adams.

MR. BENTON: Hart Benton for Mr. Adams.

MR. HELMSING: Fred Helmsing on behalf of Mr. Adams.

MR. STURDIVANT: Jim Sturdivant on behalf of Runkel.

MR. MARSHALL: Greg Marshall on behalf of Mr. Perciavalle, who is here in the courtroom.

MR. SELDEN: Your Honor, Jack Selden on behalf of Mr. Perciavalle.

MS. WINDSOR: Alyse Windsor for Mr. Runkel.

MR. BAUGH: And, Your Honor, Robert Baugh for Mr. Runkel.

MS. SULLIVAN: Your Honor, Erin Sullivan on behalf of Mr. Perciavalle.

MR. RYAN: Good morning, Your Honor. Robert Spencer Ryan on behalf of the United States.

MS. CONNELLY: And Laura Connelly on behalf of the

United States.

THE COURT: Okay. Good morning. Goodness, there's a lot. We have two joint motions to dismiss. The United States has responded to all of them. I have read your papers. It's not like anything that I have addressed before, so that's why you are here. Thank you for being here. Let's walk through it.

Who on behalf of the joint motions to dismiss is going to argue?

MR. HELMSING: Judge, I'll certainly start off and take the lead and try to answer any of Your Honor's questions, but if I cannot, as I often do, I sort of found that someone else may jump in.

THE COURT: That's fine. There's plenty of folks to jump into the breach.

MR. HELMSING: Yes.

THE COURT: Mr. Helmsing, why don't we start at the beginning. Tell me.

MR. HELMSING: Yes, sir. Judge, would you prefer I remain seated, or would you --

THE COURT: I would actually -- and so for those of you who are not usual suspects here, when we don't have a jury, I'm mostly interested in making sure we have a really good record. So you are welcome to remain seated. It's federal court. That's weird. I accept that. But I would like you

just to speak directly into the microphone. If you need to stand, that's fine. You are welcome to use the podium, but that will help us make sure we have the best record we can have. Okay. So, yes, please remain seated.

MR. HELMSING: To start with, we would like to focus on Document 129, the defendants' joint motion to dismiss based on the failure of the indictment to allege either a scheme, conspiracy, or a scheme to commit wire fraud.

THE COURT: Okay.

MR. HELMSING: And, Judge, the indictment should be dismissed because it does not allege a scheme to obtain money or property. It certainly doesn't allege the defendants, in any way, attempted a scheme to obtain money or property that belonged to the victims who have been identified as the shareholders of Austal. And under clear United States Supreme Court law, recent United States Supreme Court law, a dismissal is appropriate in this circumstance.

We have prepared a PowerPoint, Judge, that sort of highlights some of the key statements out of some of these recent cases, where the Supreme Court is making it crystal clear as to what has to be proved, what has to be asserted by the Government, what constitutes wire fraud and what does not.

And the critical word -- why don't we go ahead and pull that up if we can -- that applies and that undergirds all of our arguments here is the word "obtain." We are going to

talk about that in just a second, Judge.

But to sort of set the stage, the wire fraud statute concerns the protection of property rights. The Supreme Court has recognized in the Kelly case, which is one of the principal cases upon which we are relying, that the Government has to prove property fraud. The property at issue must place more than some bit part in the scheme. It must be the object of the fraud.

As the Court stated again in Kelly, the fraud statutes were limited to, in scope, to the protection of property rights. Again, emphasizing the word "property." And in the Ciminelli case, which we are going to talk about extensively, the Court recognized that the fraud statute reaches only traditional property interests. Valuable economic information is not a traditional property interest. That was the core holding in the Ciminelli case, which we'll come to here in more detail in a minute.

But the core requirement of Section 1343, as interpreted -- well, both in the plain language of the statute. I don't want to get away from that, but in the plain language of the statute, and also as interpreted by the United States Supreme Court on a number of occasions, is that, in order to be guilty of wire fraud, a defendant must devise or intend to devise a scheme critically to obtain "money or property."

Also another element is by means of false or

fraudulent pretenses, representations, or promises. That comes straight out of the Kousisis case, which was decided by the United States Supreme Court just last term. I think the opinion was issued in June of this year. So it is, Judge, in the most accurate sense, hot off the presses.

And just to reinforce, the Kousisis case did not change or alter the law in any way citing to the Kelly case, which was issued by the Supreme Court in 2020, mail and wire fraud statutes bar only schemes for obtaining property.

Harkening back to the year 2000, the United States Supreme Court in the Cleveland case stated that the purpose of the mail fraud statute -- for the purpose of the mail fraud statute, as we have cited -- and I think it's not in dispute here, Your Honor -- the jurisprudence in interpreting the mail fraud statute is equally applicable to interpreting the wire fraud statute. They are essentially indistinguishable from that perspective. It's just the means of transmission that differs between them. But the thing obtained must have been property in the hands of the victim. That's what the Supreme Court said in 2000 in the Cleveland case.

Again, Kousisis defines what "obtained" means, and it means to gain -- to gain or attain possession of it. I think the "it" is critical there, Judge. That's the money or property that's referenced in the statute by some planned method or action. That's the definition of "obtained" that the

United States Supreme Court adopted in the Kousisis case.

They stated again that by -- you only violate a -- a defendant only violates Section 1343 by scheming to obtain the victim's property -- money or property regardless of whether he seeks to leave the victim economically worse off. It's just a restated, reinforced, reemphasized articulation of the law that, in order to have a valid wire fraud charge or valid mail fraud charge, you have to have an allegation that the defendant sought to obtain money or property from the victim.

And, again, Judge, the -- you know, in all cases -- this is Kousisis -- and I think, Your Honor, that we bolded these. These are our bolding here for the purposes of this visual aid, but the Supreme Court, nonetheless, used the words, In all cases money or property must be an object of the defendant's fraud, the traditional property interest at issue must play more than some bit part in the scheme; critically, obtaining the victim's money or property must have been the aim, not an incidental byproduct of the defendant's fraud.

And what we have -- so we know that, in order to proceed with the wire fraud charge, the Government must establish that the defendant sought to obtain money or property that belongs to the victim, and that is what is completely missing from the indictment in this case.

If you look at what is set out in the indictment, in paragraph 14, there are two items that are referenced there

identified by the Government as what the purpose of the scheme was, actually under the heading -- purpose of the scheme to defraud.

And it is No. 1, although they labeled it as A, we have for a visual aid labeled it as 1 and 2. Maintain and increase the share price of Austal Limited's stock; and, B, unjustly enrich the defendants and others through the continued receipt of compensation, stock, and benefits. There is no statement in there that we sought to obtain anything. The word "obtain" is not used in that paragraph.

But in their responsive briefs following our motion to dismiss, the Government stated that the unjust enrichment is simply about the financial benefits the defendants received due to their scheme to defraud the shareholders and the investing public out of money or property. They are not proceeding on the theory that defendants purpose was to defraud. We would submit, Your Honor, that obviates the second item identified there in the indictment that we sought to unjustly enrich ourselves through receipt of compensation.

THE COURT: Isn't that kind of what happened in the Kousisis -- I guess I should speak into the microphone. They were -- that was a contractor who was supposed to use a disadvantaged supplier or subcontractor, and the Government entity they contracted with actually got the benefit of the contract. But isn't that what we are kind of saying here?

Essentially, like, I guess, the theory is, the defendants would not have continued to be compensated at the level they were compensated if the truth was none. I don't know. I guess I'll let the Government make their argument.

MR. HELMSING: Yes, sir, Judge. We discussed and described in our motion how continued receipt of compensation can't form a basis for a wire fraud charge. That's not obtaining money or property. That, you know, falls under a theory of deprivation of honest services that doesn't hold any water in this circumstance.

THE COURT: Okay.

MR. HELMSING: But I think the takeaway point that we submit this makes is what they are saying that the crime here was the overvaluation, if you will, of the shareholder's stock; that by providing the false information the stock was traded at a price that was higher than what it should have been, and that that is the fruits of the purported or alleged fraudulent conduct. And the defendants in no way obtained any of that. That's money or property that never -- that -- there's, frankly, no conceivable way we could have obtained the money or property belonging to the shareholders.

Pointing to the Government's responses, they indicate the object was to maintain and increase the share price of the stock, but it doesn't allege a scheme to obtain the investors' money. This isn't a situation where we sought to convince

somebody to transfer something to us that -- based on a misrepresentation or a false or fraudulent statement.

Citing there, under the Government's theory, that -- which arises directly out of the statement in their responsive brief in order to maintain or increase share price, investors must either buy or hold the stock, meaning they will be parting with their money or property.

So I think, Judge, they are alleging or asserting here a theory of a parting with, which is not the equivalent of obtaining. In order to determine that, we go back to the Supreme Court's definition of "obtaining" that is set out explicitly in the Kousisis case where they define "obtaining" as gaining or attaining possession of it -- the property, the money.

And that I think was picked up on the Supreme Court directly out of the brief that the Government submitted in the Kousisis case where they submitted the definition of "obtaining" that they defined as getting ahold of, getting possession of, or to procure or to acquire.

And, simply stated, Judge, you know, parting with is something akin to a deprivation, and the clear case law, as articulated by the Supreme Court and by the Seventh Circuit that we cite here in the Walters case, is, A deprivation of property is a necessary but not a sufficient condition because only a scheme to obtain money or property from the victim

violates the fraud statute.

So, you know, the Government, I believe, if you boil down their allegations, they deprive the -- it would be as follows: The defendants deprived the shareholders of the true value of their shares of the stock that they held by making alleged misrepresentations as to the financial performance of the company for the purposes of valuing that stock and that that is a deprivation of the value of their stock.

But a deprivation is not the same as obtaining. And what they have to prove and what they have to allege -- I mean, it's not a question of proof. We are not there yet. To the extent I have said that, it relates to the allegations set forth in the indictment. But what they have to allege at this stage is that we, the defendants, sought to obtain money or property from the victims -- here, the shareholders.

And there is no allegation in the complaint -- I mean, in the indictment, rather, that they have done -- that we have done that. And for that reason, Judge, the indictment should be dismissed.

THE COURT: All right. Let's see what the United States thinks about that. Who is going to speak to that?

MS. CONNELLY: I am, Your Honor.

THE COURT: Okay.

MS. CONNELLY: The defendants here did seek to obtain money or property. And, as alleged in the indictment, the

object of the fraud scheme was shareholder money. This case is all about money. It is about the shareholders parting with and being deprived of their money, and it was the object of the defendants' scheme to have the shareholders be deprived of their money or property.

The defendants also sought money in the form of unjust enrichment in the form of compensation, stock, and other benefits which included bonuses tied to the financial performance of the company.

The defendants sought to deprive investors by inducing them to invest in Austal Limited under the false belief that there was -- that it was generating more profit than it actually was.

And the defendants then sought to acquire that money through the unjust enrichment that they were receiving through the financial performance of the company, which included compensation, stock, and other benefits.

The defendants, thus, gained from the investors parting with their money in this case and, therefore, sought to obtain the money of those investors. And it's of no matter that the money didn't go directly to the defendants themselves or the company and, instead, was parting with on the public market, which there are two cases that the Court can rely on for this. The first, United States v. Baker, which is the Fifth Circuit case, which explicitly endorsed the fraud scheme

at issue in this case was cognizable under a wire fraud statute.

The Fifth Circuit rejected essentially the very same argument that the defendants are putting forth today, and the Fifth Circuit held that Section 1343 does not require an intent to obtain property directly from the victim. Baker enforced that the scheme at issue here is cognizable under a wire fraud theory where the defendants intended to deceive the victims out of the money for their own financial benefit. And paragraph 14 lays out precisely that scheme.

The Milton case out of the Southern District of New York also rejected this very same argument and precisely the same type of public market accounting fraud scheme where the defendant was trying to get investors to invest in the company that was traded on the public market and also did not directly receive investor money.

The defendants have cited no cases at all that suggest that this argument about obtaining in connection with a public market scheme is not -- does not satisfy the "obtaining" standard.

And even the defendants putting forward their own gloss on the cases in terms of the definition of "obtain," the Government in their reply, they state that the cases support a standard where the property was obtained or intended to be obtained by the defendant or someone affiliated with the

defendant.

Even under such a standard, the shareholder money that was obtained -- the shareholder money here was obtained by someone affiliated with the defendants. At base, a public market wire fraud scheme is a simple scheme to get new owners in the company. A shareholder in a publicly traded company is an owner of that company.

In a scheme like this one, the defendants and their coconspirators were seeking to artificially increase or maintain the share price by having new people buy into the company. And so how that happens is old owners of the company are selling their shares to new owners of the company. And so even under the defendants' own standard, these folks are, in fact, affiliated with the defendants because they are owners in the company.

In terms of the legal arguments that the defense has put forth about Kousisis, we agree. The Kousisis decision does define what "obtain" means, but it's very clear that the inquiry can't end there, as the defendants themselves seem to recognize.

Kousisis himself did not obtain the money or property at issue in that case. Kousisis was a manager of the company that obtained the contract. So it must be that it cannot be that the defendants have to personally obtain the property or that "obtain" just means to gain or attain possession of it

because under that -- under that theory, there has to be something more. And Kousisis didn't analyze the question of who is it that has to obtain the money or property.

Decisions shed light on what the Court could mean, and often sometimes it sounds in the deprivation of property, which is something that's found throughout the Kelly decision, the Kousisis decision, and even in Ciminelli where they are all talking about where the federal fraud statutes states it is to criminalize people of traditional property interests. So only schemes to deprive.

And, here, we have such a scheme where this was a scheme of depriving shareholders of their money or property. And the Third Circuit in Porat has, I think, a very illuminating exposition about how the Supreme Court often varies in how it frames the money or property requirement changing between "depriving" and "obtaining," but the Porat court noted correctly that the Supreme Court has never suggested that the defendant must seek to personally obtain property, which remains true post-Kousisis as well.

At base, Your Honor, this is a case about money, where I started, and there's nothing intangible or incidental about money to this scheme. The defendants were after shareholder money. The scheme was to deprive shareholders of their money in order to artificially increase and maintain the share price of Austal Limited which, in turn, allowed the

defendants to benefit in the form of compensation, bonuses, and ownership of their own Austal Limited shares, in the case of Mr. Perciavalle.

And I'm happy to answer any further questions.

THE COURT: Okay. No. I think I'll throw it back to Mr. Helmsing.

MR. HELMSING: So, Judge, I think what I heard my friend say is that it's a case about deprivation. And deprivation, I think, as we pointed out, is clearly not good enough. If it's a case about deprivation, then what it really turns into is the providing of false -- or allegedly providing false information to a prospective investor for the purpose of influencing them in some way, and that falls squarely under the Ciminelli case. Ciminelli is crystal clear that, importantly, valuable economic information is not a basis for a fraud charge because it is not a traditional property interest.

And so I think that if you limit this case to -- if the Government is acknowledging -- and maybe they are -- that this is -- that there isn't the necessary "obtaining" component here, then what you have is boiled down to -- even though they don't call it that -- is the right-to-control theory that was invalidated in Ciminelli, strongly invalidated, in a unanimous opinion from the United States Supreme Court.

And so that is a powerful statement, if you will, Judge, from the Court that that is not an actionable basis upon

or theory upon which you can base a wire fraud charge. The Baker case that the Government cites, I think, is probably the one that is closest to our facts.

THE COURT: So Baker and Milton, I identified both of those as endorsing the theory that's here.

MR. HELMSING: They both predate Ciminelli, and they certainly predate --

THE COURT: Everything predates Kousisis.

MR. HELMSING: Yes, sir. Everything essentially predates Kousisis, but Baker, Your Honor, was charged with engaging in financial practices that arguably inflated the value of the stock of the company.

And then, you know, the issue of the obtaining, I don't believe, was decided by the Court there. So I would -- I don't think the Baker case would stand up today based on Ciminelli and Kousisis.

THE COURT: So I'm certainly going to revisit that and look at that, but I mean, essentially the conduct alleged is essentially similar: Actions taken to inflate the value of stock; right? So Baker -- so I guess what I'm hearing is, you don't necessarily disagree with Ms. Connelly's position that Baker endorses this particular theory the Government is pursuing. I guess what I hear from you is that it endorsed it in a pre-Kousisis world, so I should consider whether that changes that opinion.

MR. HELMSING: Judge, I think the original Baker trial and the original Baker appellate opinion occurred before Kousisis -- I mean, before Ciminelli.

THE COURT: Sure. Okay.

MR. HELMSING: Mr. Baker filed a 2255 motion on the basis of the Ciminelli opinion after it came out, and that is what is cited in the Government's response. It's the district court analyzing that under a 2255 standard, and, frankly, I think the judge just got it wrong there.

THE COURT: It happens.

MR. HELMSING: It happens, but not in here, Judge.

THE COURT: It happens a lot in here.

MR. HELMSING: But what Ciminelli says is valuable economic information or potentially valuable economic information is not a traditional property right that can support a wire fraud charge. That's precisely what the -- Mr. Baker was accused of doing. I think had Ciminelli been out prior to the prosecution of that case, it would not have been prosecuted.

You know, that's a fairly significant change that was not dealt with in the case-in-chief or the first appeal or any of that. So it's only on this post-judgment -- post-conviction, rather, framework in which it's being analyzed that that comes up. And, in any event, it certainly is pre-Kousisis with the pre-endorsed reemphasis on the need to

obtain.

I don't believe Mr. Baker in that case was accused of obtaining anything from any shareholders. I don't think he -- I don't know those are who the purported victims were in that case. I think it has very little application and very little support for the core argument here that, in the absence of the defendants or even an allegation that of the defendants obtained any of the shareholders' money or property, that there's a viable wire fraud charge that's been asserted.

THE COURT: Let me ask Ms. Connelly, what is Ciminelli, Kousisis do to Baker, Milton?

MS. CONNELLY: Yeah. So in the initial instance, the 2019 Baker decision squarely addressed this issue. I'm just reading from the opinion, Baker next contends that the term "obtain money or property" in the wire fraud statute requires the Government to plead and prove that Baker "intended to obtain money from deceived investors."

So this opinion from 2019 is squarely on point. Mr. Helmsing is right that this case was then won on a 2255. There was a magistrate judge opinion that was then adopted by the district court, again addressing this exact issue in light of Kelly and I believe Mr. Helmsing is right in light of Ciminelli as well in saying that those do not affect the analysis that this was, in fact, to obtain money or property and that that was, in fact, an object of the fraud.

The Fifth Circuit declined a certificate of appealability, and cert was denied at the Supreme Court. So this has all gone up and not been changed since then.

In terms of how Kousisis -- I think getting back to Ciminelli, Ciminelli has very little to do with the facts of this case because we are not asserting a right-to-control theory. And, in looking at the Ciminelli decision and in looking at the procedural history of that case, the grand jury was instructed about right to control. The indictment returned talked about right to control and only right to control. The Government argued at closing that they were talking about the right to control information, and then they went up on appeal only on the right-to-control theory.

We are sitting here today telling you we are not proceeding on a right-to-control theory. It doesn't appear in the indictment, and that is because we are not proceeding on it. And Kousisis is really instructive on this point, Your Honor, in saying that, while obviously in a fraudulent inducement theory of wire fraud, there is going to be information that is hidden from investors. That's just necessarily how it's going to happen in a fraudulent inducement theory.

That does not convert a fraudulent inducement theory wire fraud prosecution into a right-to-control wire fraud prosecution. And this is why we cited in our supplemental

authority the Auguste case out of the Eleventh Circuit, a case which, while unpublished, we have put forth the exact same argument we are hearing now, which is that just because information was hidden, somehow that has converted a fraudulent inducement theory case into a right-to-control case, which is not, in fact -- that can't be the case, as the Eleventh Circuit recognizes. That would just turn every wire fraud prosecution on its head.

So, at the end of the day, we don't think there's anything in Kousisis. We agree with Mr. Helmsing that there is nothing in Kousisis that is changing the law. They did define "obtain," but, as I mentioned in my earlier remarks, obviously the definition of "obtain" can't be the end of the inquiry in light of the decades of precedent of what constitutes wire fraud.

THE COURT: Okay.

MR. MARSHALL: Your Honor, could I jump in with regard to Milton and Porat --

THE COURT: And just so I can make sure that you state your name. And it goes for everybody because there are so many lawyers, and I don't want to just rely on the notes and code for who is speaking when.

MR. MARSHALL: Greg Marshall on behalf of Mr. Perciavalle. Judge, Ms. Connelly also cited to the Porat case and the Milton case. We distinguish those cases. They

are easily distinguishable from our perspective. We do so on pages 4 and 5 of our reply filing. Mr. Milton, the allegations there were he engaged in a scheme to obtain investors' money, to directly obtain investors' money by inducing them to buy stock in his company and then selling his own. So there was a clear tether, Your Honor, between the investors' money and then money that he obtained as a result of his scheme.

Ms. Connelly stated that Porat states that the thrust of it is that a defendant doesn't have to personally obtain the property at issue, and we have no -- that's absolutely true, but that isn't the crux of this issue. A defendant can direct that somebody else obtain the property pursuant to their scheme, and that's what Mr. Porat did. He was the dean of a business school. He engaged in a scheme to increase the reputation of the school and he did so on behalf of the school. And the money that flowed was tuition payments and donations by donors to the school.

So Porat was really -- really doesn't speak to this issue. If a defendant engages in a scheme to defraud to obtain the victim's money but directs that money to, say, a family member or some other favored third party, that is wire fraud. We don't dispute that, but that has no relevance, we believe, to this inquiry.

The bottom line, Judge, is the Government has not alleged any kind of tether between the losses that the --

alleged losses, the parting of investors of their money to obtain these Austal shares. That's done on the secondary market. That is people buying and trading on either the Australian market or the United States over-the-counter market. So these are all shares that have already been issued by the company, and these are just dealings between these buyers and sellers. It has no -- none of that money comes back to the defendants in this case. There is no tether. There is nothing that attaches the parting of the investors' money with any kind of obtaining by our clients or by anybody our clients wanted to obtain pursuant to the scheme.

MS. CONNELLY: Your Honor, the Milton case -- I just want to make sure we are understanding. It is a public market scheme. So while it is true that, perhaps, he was selling his own shares, Mr. Milton was having investors buy on the public market. He was not having the investors buy his shares.

And I think the decision itself talks about how he actually didn't successfully sell any of his shares, and the court says it's of no moment; it doesn't actually matter. He wants to obtain the victim's property here by having them buy into the public market. That's why we are citing Milton.

In terms of the tether, there is a tether here, and it's that the defendants here, as alleged in paragraph 14, are looking for investors to part with their money on the public exchange. Obviously that money is going to third parties, and

that allows them to personally enrich themselves because the increased share price benefits them. It benefits their company. And this is classic public market accounting fraud scheme where a company is benefited by having a higher share price of its stock. It has access to more capital. It raises its market value. All of that stands to benefit the company.

MR. MARSHALL: None of those things are in the indictment. We have no confidence that that was presented to the grand jury, and that may -- that may all well be the case, but none of that is put forth, set forth in the four corners of the indictment.

THE COURT: Okay. Ms. Connelly, you say that's what paragraph 14 says.

MS. CONNELLY: Yes.

THE COURT: Okay. Well, I'm not ruling from the bench on any of this. So know that I'm gonna -- this is putting meat on the bones that are in the papers that you filed. So I'm gonna --

MR. STURDIVANT: You know, may I -- Jim Sturdivant on behalf of --

THE COURT: Pull the microphone toward you.

MR. STURDIVANT: I'm so sorry. Your Honor, I want to say I was struck by a couple of things, and I just want to respond to them on behalf of Mr. Runkel. First of all, it sounded like the Government is essentially arguing that

"deprive" and "obtain" actually do mean the same thing somehow, which we strongly -- I think all the defendants we say, "Look at Kousisis." It's very clear. I mean, they actually quote a dictionary definition, and they talk about obtaining it, meaning the property, that the victim had and obtaining it. That is the phraseology that Justice Barrett uses in that opinion.

And the Government in that case was very happy about the "obtaining" because the issue was not obtaining. The issue was whether there had to be an economic loss. And so Justice Barrett, in deciding the case, was very clear about here's what wire fraud is, and one of the main "is's" of wire fraud is that you obtain it, meaning the property. And we think a fair reading of Kousisis makes that just absolutely indisputably clear. But the Government doesn't seem to want to admit that "deprive" and "obtain" do not mean the same thing.

The second thing I just wanted to say very briefly is that my friend alluded to the decades of precedent. Decades of precedent. If you look at the United States Supreme Court, Your Honor, starting with McNally, the Court has said again and again and again and again that the wire fraud statute is conjunctive, not disjunctive. Even though the wording is confusing, they have clearly said that.

And again and again in McNally, in Cleveland, and then now most recently in Kelly in 2020, and again in Kousisis,

the Court has said there's got to be an object. The object of the scheme must be in order to avoid over-criminalization of every business dispute out there. The object of the scheme has to be the obtaining of money or property.

And as was said in the -- I believe it's in the Walters case, which is the Seventh Circuit case, but that case was also cited by the court in Kelly, the 2020 case. A deprivation is necessary but not sufficient.

And, here, the Government with all respect to my friends, seems to be really trying to get around that. And I would say if there's anything about -- you know, if you want to throw around the term "decades of precedent," let's look at what the Supreme Court has held repeatedly and the Government, perhaps for understandable reasons, but the Government -- you see a pattern of the Government coming back again and again and again.

And as was said in Kelly, when the Government tried to argue in Kelly that because money was spent on salaries or money was spent for supplies or, you know, there was an economic factor in the case, in other words, there was an issue about how money was being spent or you could point to that and say money was being spent, the Court said the object of the fraud was not to obtain money or property. And, here, the Government itself has alleged that the object of the fraud was to prop up the share values. But that's not obtaining money or

property. Thank you, Your Honor.

THE COURT: Okay. Anything else you want to say about that?

MS. CONNELLY: I think just two things. The first is the Walters decision. The Seventh Circuit itself has said that that conversation about the "obtaining" is dicta in the Seidling case, which I'm happy to provide the cite if you need it. That's a 2013 case out of the Seventh Circuit.

THE COURT: Why don't you just state the citation.

MS. CONNELLY: Yes. So it is 737 F.3d 1155.

THE COURT: Thanks.

MS. CONNELLY: But, in general, the object of the fraud here was to obtain shareholder money. The only way that one can maintain and increase a share price and maintain and increase the stock of a company is to have investors part with their money or property, and that is precisely what we have alleged.

THE COURT: Okay. All right. Mr. Helmsing, what's next?

MR. HELMSING: Next, Judge -- I'm assuming Your Honor has heard everything you want to hear on the first motion?

THE COURT: Sure. Well, you tell me. Is there anything else you want to say on the first motion?

MR. HELMSING: Well, Judge, I did specifically want to respond to the reference to the Auguste opinion because it's

a recent Eleventh Circuit opinion, and I think at the risk of perhaps, you know, repeating again the critical allegation that existed in Auguste that underpinned the Eleventh Circuit's determination that they had, in fact, properly alleged wire fraud is that the allegation there was the defendant sought to obtain money or property from the purported victims.

That case involved a scheme to issue false credentials for the purposes of nurses being able to get their licenses and work as nurses. And so there was sort of a nondirect line of payment between the people employing the -- the entities, rather, employing the nurses who were not properly credentialed and the defendant who was charged.

But what they had there that we don't have here is the straightforward allegation and clearly set out allegation that the defendant was seeking to obtain the money or property from the victims in that case that were paying the money to the -- you know, to the people she was working with for the purposes of providing the false credentials. That's the missing ingredient out of all of this.

And, you know, when you look at paragraph 14, it's just not there. The statements that would need to be necessary in order to establish a wire fraud factual basis for a wire fraud charge just simply are not there.

THE COURT: Okay. All right. Well, tell me about the second motion to dismiss.

MR. HELMSING: Yes. Judge, the second motion, which for the record is Document --

THE COURT: 133.

MR. HELMSING: Right. It is premised on the application of the statute of limitations. There are two components to it, Judge. The allegations that are contained in the indictment as to Count 1, Count 7 and Count 8 are that the conduct at issue or the conduct at issue under those counts is subject to a 10-year statute of limitations under the statutory provision that provides a 10-year limitation period for crimes affecting a financial institution. And the clear word is "affecting" a financial institution.

Judge, it sort of piggybacks -- well, so we submit that it is inappropriate to apply that 10-year limitation period for the very reasons we have been discussing, that the conduct at issue here -- the Government acknowledges that the scheme that they contend undergirds these charges was not directed at a financial institution.

And we submit, Your Honor, that the law on that subject has migrated since the Eleventh Circuit issued their opinion in the Martin case, where they very -- set out, in all candor, ruled in a manner that is not particularly helpful for us.

But we would submit, Judge, were they to look at it now in light of the changes in the law that have occurred or

the clarity that has been supplied to the law under Kelly, Ciminelli, Kousisis, that they would no longer set out such a loose framework under which conduct affects a financial institution, that it would have to be the object of the fraud in order to qualify for that additional limitations period.

So that's the argument as it relates to Counts 1, 7, and 8, wherein the 10-year limitations period is specifically invoked.

Then, as to Counts 2 through 6 that are substantive wire fraud counts, Judge, our argument is that the limitations period had expired before the Government sought the application of the tolling that's available under -- I think it's Section 3292. And by virtue of the fact that they had expired, they can't be revived.

You know, tolling does not mean reviving an expired statute of limitations. It's something that merely suspends one that's still in place. And so since those counts were all barred by the passage of 5 years, they can't be reinvigorated by the application to the Court for the tolling protection that that statute envisions. So, therefore, they are barred. They are not covered by the 10-year limitation set out that is described in the statute dealing with crimes that affect a financial institution. So those, 2 through 6, I think that adds up to five counts should be dismissed with prejudice as time barred.

THE COURT: Okay. Who is speaking to that?

MR. RYAN: Thank you, Your Honor. Spencer Ryan on behalf of the United States. In reference to the defendants' second motion to dismiss, taking the first issue first of Counts 1, 7, 8 and the meaning of "affects a financial institution" for purposes of 3292, there is binding Eleventh Circuit precedent on this issue that has not been overruled. As the defense just mentioned, the Martin case, 803 F.3d 581 Eleventh Circuit 2015. The most recent Eleventh Circuit case, unpublished Rojas opinion, which comes to the same conclusion in 2020.

This is just not a situation where there has been a subsequent decision that is clearly contrary to prior precedent. So the Government believes that that ends the inquiry as opposed -- with respect to the defendants' first argument. There's binding Eleventh Circuit precedent that the Court has to follow. The meaning of "affects a financial institution" is that has to lead to an increased risk of loss to a financial institution. That is exactly the scheme that's alleged in this indictment; and, therefore, there's a ten-year statute of limitations for Counts 1, 7, and 8. All three of those counts were brought timely.

THE COURT: So if I can just interrupt you for a second.

So, Mr. Helmsing, if what he's saying is right, even

though you think the analysis of the Eleventh Circuit is wrong, isn't that really for me to follow and you to appeal me and have them say you are right instead of me just saying I'm gonna -- I don't agree with what the Eleventh Circuit said in light of the law that's changed since then?

MR. HELMSING: Judge, I think that would be -- I think Your Honor could -- we have cited authority in our papers where there's a clearly obvious change, that the Court can take that into consideration, and I think that's what we would be asking Your Honor to do.

I mean, in candor to the Court, the Martin case says the opposite of what we are advocating, and we don't -- I wouldn't want Your Honor to appreciate my comments here to be anything other than a recognition of that. But we feel like these later cases would change the analysis that's set out in Martin and provide a basis for the Court to determine that the Eleventh Circuit would interpret the 3293 statute more strictly.

THE COURT: Okay.

MR. HELMSING: I'm not 100 percent positive I answered your question, Judge, but I suppose traditional thinking probably would suggest that Your Honor follow the course you described.

THE COURT: Okay. All right. Mr. Ryan, sorry.

MR. RYAN: Yes, Your Honor. And I'm just to touch

off on the first point. If the Court were to look past the Eleventh Circuit's decision in Martin, the Government, based on its arguments in the papers, believes that the word "affects" in that statute is completely unambiguous and relies on the arguments in its papers with respect to that if the Court were to reach that.

Turning to the second argument, which from the Government's perspective is actually two separate pieces on a 3292 because Counts 2 -- Count 6 would be timely regardless of the Court's interpretation of the differing opinions reached by courts on whether or not the tolling starts when the official request is made -- I'm sorry. Not when the tolling starts. But whether or not the statute of limitations, if it has expired by the time of the application, whether the operative is when the official request is made or when the application is made as to whether the statute has expired.

I said that in a very convoluted way. But Counts 2 through 5, there's no dispute here that the official request was made prior to any of the five-year statute expiring as to those. And the application was made after the time frame for the statute of limitations and was expired for Counts 2 through 5.

I think both parties have briefed the issue in the papers where there are five cases that support the Government's position that the only requirement is that the official

requests were made prior to the expiration of the statute of limitations, and then there are four cases that support the defendants' position that the application must be made prior to the statute of limitations expiring.

So the Government would rest on the arguments in the papers there and emphasize that the Court should follow the five opinions that support its position as opposed to the four that support the defendants' opinion.

With respect to Count 6, it's on different footing as they are -- not only would the Court have to reach the defendants' position on when -- whether it's the application or the official request, but, also, there's an argument that the Government did not request evidence of an offense in the July 2020 supplement official request, and, there, the defense has cited no case in support of their proposition. There is no basis for that.

The Government would rely on its papers as far as the cases it cited from the Eleventh Circuit, the Broughton case, the Lyttle case in the Second Circuit as far as what is required for the Court to find in order to enter an application tolling, and even if the Court were look to the specifics of that July 20th, 2020 request, the information requested is certainly evidence of the offenses charged in this indictment.

THE COURT: Okay. Anything else you want to say?

MR. HELMSING: Judge, we distinguished the Broughton

case and I think the Lyttle case in our submission, and I think our -- well, our position there is, you know, identifying victims is not evidence of the crime. There's no element, as we've been over exhaustively, as to what you have to show in wire fraud, such as has been charged here, that the identity of the victim is an element of that.

So evidence relating to that wouldn't support -- would not be supported by the request that the Government made for that information, and they shouldn't get the benefit of any kind of tolling associated with that.

THE COURT: What do you think about that, Mr. Ryan?

MR. RYAN: Your Honor, the information that was requested, the Court considered the application and found that at the time it was submitted that the evidence requested was evidence of the offenses under investigation at that time, and all that's come back from those requests has been produced to the defendants in discovery post-indictment, and the Government's position is that the evidence requested is relevant to the crimes in this case.

There are two kinds of categories in that July 20th, 2020 supplement of information. One is information from banks that are located in Australia. Austal had a syndicated SFA -- syndicated finance agreement. Four banks participated in that agreement. Bank 1 and Bank 2 listed in the indictment are U.S.-based banks. The other two banks

are Australia-based banks. And so the request was for information related to the syndicated financial facility from the Australia-based banks. So that is evidence of the offenses that were being investigated at the time.

So the second category of information is for shareholder information. So victim shareholders for, you know, information about who they are, how many shares they owned, periods of holding, information such as that which, again, is evidence of the offenses charged. So that's my response to defense's position on that piece.

I just wanted to -- I think I may have misspoke on my earlier comments. For Count 6, the only issue the Court has to reach is, is this evidence of a crime issue as the other two arguments we have made, that the defense has made on statute of limitations don't impact Count 6. I just want to clarify I misspoke there.

MR. HELMSING: And just trying to get the last word. Evidence of who the victims are and amount of loss is not evidence of -- that would be properly covered by that request, and, therefore, that count is untimely.

THE COURT: Okay. All right. What else do you want to tell me? Anything? Your answer can be "nothing."

MR. HELMSING: Judge, I'm happy to answer any questions you have, but I think we've -- you know, we've put it all out there, so to speak.

THE COURT: You don't have a PowerPoint for me for the second --

MR. HELMSING: No, sir, I do not. It's so straightforward and due to be granted, we didn't even --

THE COURT: I'm a picture person.

Does the United States have any objection to making that PowerPoint an exhibit to this hearing?

MS. CONNELLY: No, Your Honor.

THE COURT: So the record can reflect everything that was presented and considered.

Okay. Well, then we'll make that Court's Exhibit 1.

MS. CONNELLY: Yes.

MR. BENTON: Your Honor, I have copies.

THE COURT: Okay. Anyone else have anything else you would like to say?

MR. STURDIVANT: Your Honor, on behalf of Mr. Runkel, we appreciate your attention this morning to getting us this time, and I don't have anything further to add.

THE COURT: Okay.

MR. MARSHALL: Your Honor, nothing further from Mr. Perciavalle's team. Thank you.

THE COURT: Anything else from the United States?

MS. CONNELLY: Nothing, Your Honor.

THE COURT: Okay. Well, like I said at the beginning, this is not the typical motion to dismiss that we

see, so that's why I had you all come here. I know many of you traveled to be here. Thank you for doing that.

I think this is helpful, and we will return to work on getting you an order.

So anything else, while you are here, we could talk about? I know you see Judge Nelson on a regular basis, at least talk with her on a fairly regular basis. So, certainly, I try to stay in my lane and not become involved in what she's doing, but is there anything that we can take up that's beneficial to the good order of this case while you are here?

MS. CONNELLY: There's nothing from the Government.

MR. HELMSING: Judge, I appreciate Your Honor's invitation, but I don't -- nothing comes to mind.

THE COURT: It's always risky to ask lawyers if they have something they want to say because lawyers are lawyers because they like to say things.

Okay. Fair enough. Thank you again. We'll get you an order.

[Recess.]

STATE OF ALABAMA)
:
COUNTY OF MOBILE)

**UNITED STATES OF AMERICA**
**VS.**

**CRAIG D. PERCIAVALLE;**
**JOSEPH A. RUNKEL;**
**WILLIAM O. ADAMS,**
**CASE NO. CR23-00070**

I, Melanie Wilkins, do hereby certify that the above and foregoing transcript of proceedings in the matter aforementioned was taken by me in machine shorthand on September 05, 2025, and the questions and answers thereto were reduced to writing under my personal supervision using computer-aided transcription, and that the foregoing represents a true and correct transcript of the proceedings upon said hearing.

I further certify that I am neither counsel nor related to the parties to the action, nor am I in anywise interested in the result of said cause.

Dated: September 05, 2025
Pages 1 to 40, inclusive

Melanie Wilkins Digitally signed by Melanie Wilkins
Date: 2026.06.05 13:59:27 -05'00'
______________________________
Melanie Wilkins, Official Court Reporter
Registered Merit Reporter
Certified Realtime Reporter
U.S. District Court, So. District of AL
155 St. Joseph Street
Mobile, Alabama 36602