IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

```
UNITED STATES OF AMERICA, *
        Plaintiff,        *   23-cr-70
                          *   May 15, 2026
vs.                       *   Mobile, Alabama
                          *
CRAIG D. PERCIAVALLE,     *
JOSEPH A. RUNKEL,         *
WILLIAM O. ADAMS,         *
        Defendant.        *
***************************
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE

FOR THE UNITED STATES:

MR. JOSHUA DAVID ROTHMAN, ESQ.
DOJ-Crm
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20001
202-8880-0257

MS. LAURA CONNELLY, ESQ.
DOJ-Crm
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20005
202-538-3624

MR. CHRISTOPHER JOHN BODNAR, ESQ.
U.S. Attorney's Office
11 North Water Street
Suite 30100
Mobile, AL 36602
251-441-5845

FOR THE DEFENDANTS:

MR. GREGORY MARSHALL, ESQ. (Perciavalle)
Bradley Arant Boult Cummings
1900 K Street NW
Suite 800
Washington, DC 20006-1113
202-719-8207

MS. ERIN KATHLEEN SULLIVAN, ESQ. (Perciavalle)
Bradley Arant Boult Cummings
1615 L Street NW
Suite 1350
Washington, DC 20036
202-719-8208

MR. JAMES R. STURDIVANT, ESQ. (Runkel)
Dentons Sirote
P O Box 55727
Birmingham, AL 35255
205-930-5124

MR. ROBERT RICHARDSON BAUGH, ESQ. (Runkel)
Dentons Sirote PC
2311 Highland Avenue S
Suite 500
Birmingham, AL 35205
205-930-5307

MS. ALYSE NICOLE WINDSOR, ESQ. (Runkel)
Sirote & Permutt, P.C.
2311 Highland Avenue South
Birmingham, AL 35205
205-930-5427

MR. FREDERICK GEORGE HELMSING, JR., ESQ. (Adams)
McDowell, Knight, Roedder & Sledge
P O Box 350
Mobile, AL 36601
251-432-5300

MR. THOMAS HART BENTON, III, ESQ. (Adams)
Jones Walker LLP
11 North Water Street
Suite 1200
Mobile, AL 36602
2510439-7530

MS. AVERY B. PARDEE, ESQ. (Adams)
Jones Walker LLP
201 St. Charles St. Fl 51
New Orleans, LA 70170
504-582-8358

COURTROOM DEPUTY: MS. TINA WOOD

COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

Proceedings recorded by DIGITAL COURT RECORDING and later transcribed by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

**P R O C E E D I N G S**

(In open court.)

COURTROOM DEPUTY: We're on the record for a pretrial conference and motion hearings in the United States versus Perciavalle, 23-70.

Counsel for Mr. Perciavalle, please announce yourself for the record.

MR. MARSHALL: Good morning, Your Honor. Greg Marshall on behalf of Craig Perciavalle. And my colleague, Erin Sullivan, is also here with me.

COURTROOM DEPUTY: For Mr. Runkel.

MR. STURDIVANT: James Sturdivant along with Robert Baugh and Alyse Windsor.

COURTROOM DEPUTY: And for Mr. Adams.

MR. HELMSING: Fred Helmsing here on behalf of Mr. Adams along with Hart Benton and Avery Pardee.

COURTROOM DEPUTY: And for the government.

MS. CONNELLY: Good morning. Laura Connelly on behalf of the United States.

I'm joined at counsel's table with Josh Rothman and Chris Bodnar with the U.S. Attorney's Office.

THE COURT: All right. Good morning, counsel.

So because I'm an eternal optimist, anything resolved before we get to it? Okay. So we'll get to it.

I'm just -- I was just going to just take them in

order.

What I've got is -- and I -- I know it's counterintuitive, but since we're making a recording, if -- you can't stand up. You need to either be at the lectern, if you're more comfortable that way, or just seated in front of a mic. And either way is fine.

We've got Document 199, which is the defendants' joint motion to compel the government to identify *Brady* information. And the government filed their response at 208.

Then we've got Document 200, which is defendants' joint motion to compel review of the SEC's investigative materials for exculpatory information. Government filed a response at 207.

And then we've got 204, which is the government's motion to take the deposition of the individual in Australia pursuant to Federal Rule of Criminal Procedure 15. And we've gotten the defendants' opposition at 206.

So I'm just going to start them in order. Let's do the *Brady* one first. Who's going to handle that?

MR. STURDIVANT: Your Honor, James Sturdivant for Mr. Runkel. And it's possible that my colleagues from the other defense teams may want to add a little bit or maybe more than a little bit to what I have to say.

THE COURT: That's fine. That's fine.

MR. STURDIVANT: I'm going to take the lead on that.

THE COURT: Okay.

MR. STURDIVANT: Your Honor, good morning. It's good to be here in Mobile and good to be back before Your Honor. We appreciate your time this morning very much.

Your Honor, first of all, on our motion, I want to just say at the outset: We are -- we are not asking the government to do any additional work or perform any additional tasks beyond identifying *Brady* information that the government has already determined should be *Brady* information. And I just want to make that clear. And I'll get into that a little bit more in a moment.

But as Your Honor is aware, that the document production in this case or the universe of documents in this case is massive. 17 million documents. Basically 50 million pages with 17 million documents.

Just -- just as an illustration, Judge, if you take the universe of documents that we have in this case and you run the three defendants' first and last names, just that, you get 3.1 million documents; first and last names of government principal witnesses, 1.3 million documents. If you input the term "LCS," which is the ship at issue in this case, the naval ship, 4.4 million documents. Just -- again, just to illustrate the massive amount of material that there is to go through.

And, Judge, all we're essentially asking the government to do is what the government agreed to do in the

*Skilling* case. If the Court would look or would let me provide the Court with a cite which is the underlying federal district opinion that *Skilling* was -- that was the foundation for the Fifth Circuit's *Skilling* decision, in that case, Judge, at page -- I believe it's -- well, I'm not sure what the pinpoint cite is, but I'll find it.

THE COURT: Is it in your brief?

MR. STURDIVANT: It is in our brief, yes, ma'am.

But in that case, Judge, the government indicated that it was, quote, not going to rely on the defense to somehow find *Brady* information; it was going to specifically identify *Brady* information.

And, Judge, while the government makes much of the Fifth Circuit's *Skilling* decision, the foundation of that decision was the case that's set out at -- in our brief. And the cite for that case is *U.S. v. Causey*. It's part of that whole backdrop of the *Skilling* case. And it's 356 F.Supp.2d 681, and it's a 2005 decision.

And so I just want to reiterate at the start that we are asking that of the government that the government did in the *Skilling* factual background. And it's against that background that we are coming to the Court and asking the Court to use its inherent authority to establish whatever -- you know, you could use many analogies, ground rules, rules of process for the trial.

For this particular case, this Court is in the unique perspective of saying, this is how we're going to try this case; these are the ground rules.

And we are asking in this case, Judge, that the government be required to merely identify that which they have already determined to be *Brady* information. And we have asked the government for that continuously. And so we're now at an impasse.

THE COURT: Let me ask you something. I should -- excuse me for interrupting you.

So I noticed in the defendants' characterization of this they talk about open file. But then I notice the government doesn't characterize it that way. I was just trying to find some sort of way to merge those two things.

MR. STURDIVANT: Well, I don't know if this will be particularly exactly and precisely responsive to your question, but I -- for example, we have asked the government to provide us -- and this is just by way of example. We have asked them to provide us with grand jury testimony of the government witnesses who testified before the grand jury who were law enforcement agents.

The government has declined to provide us with that. I'm not necessarily saying at all that it's improper for them to have done that, but were this an open file case, to me, we would have basically -- that would be an example of the type of

information we would have.

THE COURT: Okay. So you're not -- okay. So you're not saying that this is an open file.

MR. STURDIVANT: We are not saying that this is an open file.

THE COURT: Okay. Okay.

MR. STURDIVANT: We do say and we have said in our papers and we've said before that the government has been, you know, responsive, has worked with us. And they talk about that in their papers as well. But we're not saying it's open file.

THE COURT: And you're not alleging a *Brady* violation.

MR. STURDIVANT: We are not alleging a *Brady* violation.

THE COURT: You're just -- it's my understanding it's just, like, in the interest of fairness because of the voluminous nature of the documents and the span of how long it's -- this has been going on that you think this falls outside of the general *Brady* analysis and that something else needs to be done.

MR. STURDIVANT: Precisely, Your Honor.

THE COURT: Okay.

MR. STURDIVANT: And if I could just carry that point a little forward.

THE COURT: Sure.

MR. STURDIVANT: So one of the things that I think is

useful to understand when it comes -- when I was alluding a moment ago to the examples I was giving when you run the names or, you know, use certain search terms or whatever, this is by no means -- the way that this data is loaded and managed and handled is very complex and you don't simply -- it's not like if you do a Google search or something or even a Westlaw search where you can -- you can say, I want to have all the cases from the Eleventh Circuit from this year to that year --

[Unintelligible cross-talking.]

THE COURT: I was going to ask you that because you talk about running the names.

MR. STURDIVANT: Yes.

THE COURT: Can it be a, you know, like, combined terms or is it restricted to just one -- I mean, so, for example, you put Mr. Perciavalle's name in and then something else to winnow down that result.

MR. STURDIVANT: It's -- it's more -- it's more cumbersome than that. My term for it, which may be probably kind of a goofy term, is clunky. It's very clunky.

And, Your Honor, so when you perform -- when you're trying to manage this -- these documents, we've had -- all three firms have had, you know, just incredible numbers of hours with various people at our firms, lawyers, paralegals, doing searches.

We also at one point utilized the services of

approximately 40 contract lawyers who worked approximately 40 hours per week for two months with the goal of identifying documents which might be relevant. That was the focus of those 40 contract attorneys was just identify documents that we then have to look at. We didn't rely on them to analyze the documents or beyond just this might be a relevant document. Just as an example.

And when it comes to the way you have to do the searches, there's issues with native -- native files versus text files. It's very -- you know, you have to make sure that you take -- your extraction is a round peg that then goes in a round hole.

And, Judge, if you'll indulge me just for a second, it really occurred to me, being an Auburn fan, when Pat Dye gave his post-game speech to the Auburn Tigers in 1989 after they defeated the University of Alabama in the first-ever Iron Bowl played at Jordan-Hare Stadium --

THE COURT: Sadly, I graduated in '82, so I missed all the good years.

MR. STURDIVANT: Well, I didn't know you were an Auburn graduate. I promise I didn't know that. I know you may not believe that --

THE COURT: So is my child.

MR. STURDIVANT: -- I did not know that.

Well I was class of '84, so we might have seen each

other on the concourse.

But what Pat Dye said in that famous speech, at least famous for Auburn fans, is -- when he was telling the team how much they meant to him, he said, I ain't smart -- I ain't smart enough to tell you how much I think of ya. I'm not smart enough to explain how I feel about you.

And I feel like when I start talking about all this technical stuff, I'm not -- I'm kind of, you know -- I'm not really there. So it may be that one of my colleagues will backfill me a little bit on that part because I do think that's important to understand that the way -- because of the way the data is extracted when they did the search warrant and then other document production, as well, from third parties which leads us to the whole 50 million pages and 17 million documents -- it's all -- it's not organized in a way that is the way it was organized. So that's a problem too.

THE COURT: I guess what I'm struggling with, too, is -- and you all can address this because I know you mentioned somewhere -- I can't remember if it was this one or one of the others -- or the SEC one about having some technical troubles getting to it. But I guess my -- just from a very basic thought is: Just because it's onerous for the defendants, does that mean that the government has to do something else that it doesn't -- would not normally have to do?

I mean, I -- there are lots of cases that are

voluminous. As a matter of fact, we, with the advent of the wire fraud cases and with the audio recording things that we have and the phone taps, wiretaps -- that's the word that's eluding me. Probably 95 percent of the cases could be qualified as that. And I know this one goes even farther because those are some large numbers, but I guess that's where I'm -- where I'm struggling because you all say, okay, it's -- yeah; we're not saying it's a *Brady* violation. We're just saying because of the nature of this, there's -- there should be more.

MR. STURDIVANT: Yes, Your Honor.

And, again, I think -- I think where we're coming from is we are not at the stage where, you know, a court -- like, the government makes the point in its papers that no court of appeals has ever required a court to do this or has ever required the government to do this.

But, again, in really what is one of the very key cases, the *Skilling* case, the Fifth Circuit opinion, in the underlying record and as reflected in that district court opinion that I just cited to the Court, the government did in that case what we are asking them to do in this case.

And there's -- there are a ton of similarities between this case and that case. And, again, in that case, record goes up to the Fifth Circuit. The government did that. And that's all we're asking is: Tell us what you, the government, have

already determined to be *Brady*. Show us where that is.

If you think of the analogy of the haystacks, there's a bunch of haystacks in the field. You know, there's a hundred haystacks. Tell us the two to look in or whatever. I mean, whatever analogy one wants to use, give us some indication -- you know, you don't have to disclose why you thought it was *Brady* or -- I mean, but just give us the -- you know, whether it's by Bates label number or other identification. Just tell us, you know -- tell us the documents that you, the government, in your -- as part of your responsibility under the constitution, the rules of federal court, the *Brady* decision itself and its progeny, tell us what you determined, as you're required to do, is *Brady*.

And, you know, Judge, I -- in the government's papers, they talk about that we're asking the Court to apply fairness. I think it's on Page 6 of their --

[Unintelligible cross-talking.]

THE COURT: I think you used that term, didn't you, in your brief?

MR. STURDIVANT: Yes.

And I guess what I would say, Judge, is, you know, the government has put quotes around the word "fairness" as if perhaps to -- you know, to kind of scoff at the idea. And I have great respect for our colleagues on the other side, but I did note that that word was in quotes.

And we are asking for fairness. We're asking for fairness as the Court fashions the rules by which this case is going to move forward toward trial.

So we're not ashamed of the fact that we're asking for fairness. And we're not -- we're kind of somewhat at a loss that we are being -- that the idea that we would ask for fairness is somehow unacceptable or inappropriate.

I think my other colleagues may want to add on behalf the other defendants --

THE COURT: Sure.

MR. STURDIVANT: -- but that concludes what I was prepared to say to Your Honor.

Thank you.

THE COURT: Okay.

MR. HELMSING: Judge, I did want to, I guess, directly respond to your question about whether you can run multiple searches at the same time.

The platform we have does allow us to do that, but that only marginally helps reduce the size of the response.

So, you know, given the prevalence of some of the key terms, we can run, say, clients' names with the word "accounting" or the word "LCS." You can do that sort of search, but you still -- just because the pool from which the documents are drawn is so large --

THE COURT: Large -- it's not going to reduce them in

any meaningful way for you.

MR. HELMSING: Yes, ma'am. Does not do that much.

And the other thing I think that's worth noting here is the government -- and they identified in their response the steps they have taken to try to point us in the right direction, so to speak. And those are very helpful.

But I -- as we, I believe, have pointed out, we -- through the process we have done, we've had, you know, a not insignificant amount of time to do it -- have -- are continuing to find documents that are not included within what the government has shared with us in terms of the, you know, discreet identification of some categories of documents. "High" was a group and then "responsive."

So this is really -- and I think the crux of this is to make sure that we can best identify the documents that might be relevant from a *Brady* perspective; that that's really, I think, the reason we're asking them to share that additional category of information with us.

THE COURT: Okay. Anything else from defendants?

MR. MARSHALL: Nothing from Mr. Perciavalle, Your Honor, at this time.

THE COURT: Who's going to field it?

MR. ROTHMAN: Thank you, Your Honor.

Josh Rothman here on behalf of the United States.

THE COURT: Okay.

MR. ROTHMAN: I wanted to start with this notion of fairness. And I want to apologize to my colleagues if my use -- my personal use of quotes was not intended to -- let me talk to the Court -- I'm sorry -- to say anything more than I was trying to quote their standard. I was trying to say, as to the *Brady* violation, this is a fairness standard. There was not anything more to those quotes than that. And I apologize if -- like, sometimes when we send texts to one another, the tone gets lost. If that tone got lost, I wanted to just start by saying sorry.

What I want to start with is just talking a little bit about the documents themselves because part of the problem, as has come up in prior hearings -- I've had the benefit of those transcripts; I wasn't here for them -- is that there's this list that the government -- that we hear from the defense the government has this list.

We actually don't have any such list of documents that we have identified as *Brady*. And I want to talk about why that is.

It's a practical problem which is that the rule of *Brady* is a rule about where the government has to look. Right?

So you take everyone on the prosecution team; you gather documents from them; and what the justice manual, which is the policy book that governs our conduct when it comes to discovery, says is, in cases where you have a large volume, you

can just gather and turn it over. And that is what we've done here.

And that comes from the justice manual at 9-5.002. And the Court can see that. There's a letter attached to their brief, Docket 199-1 at Page 27, where we cite this justice manual provision that we can give the defense access to the large volume of documents to avoid the possibility that a well-intentioned review process nonetheless fails to find material discoverable evidence.

THE COURT: Isn't that an open file?

MR. ROTHMAN: It is not. It is a slight distinction.

So, to my understanding, an open file means come to my office; look at my computer; you have access to everything that I have.

There are still categories of documents that we have not turned over, either not yet or just we have not yet turned over. Very small categories. One of them counsel mentioned, these grand jury transcripts of the agent. That would potentially be *Jencks* if the agent testified. I don't believe that agent who testified in the grand jury will testify. And so there's a question about -- in an open-file world they would have access to it. In a world in which we still get to make decisions about what is Rule 16 and what are obligations are --

THE COURT: Which is sometimes conflated, the *Jencks* and -- I mean, it's sometimes conflated.

MR. ROTHMAN: Certainly, certainly true.

And part of the reason why we don't have such a list is that this is not like a bank robbery case where there's a pole camera that faces the bank and we can go look at that pole camera footage and see is this defendant walking out of the bank or not. In that case, of course, we have a duty to go get that footage and, if it's *Brady*, turn it over. And if it's inculpatory, we would turn it over, too.

Here, there is no defense relating to whether this defendant is the person who has been charged. The issue in this case comes down to what do these defendants know and then what was their intent.

And in that way, it's impossible for us to create a list of all possible *Brady* information. Just to use one example, we've charged -- so we've charged CEO and we've charged two other corporate executives.

Is every hot document that the CEO is not on *Brady* as to his knowledge? He might come in at trial and say, I didn't know. And is every email that he's not on considered *Brady*?

There are millions of documents in this case that could be read in any number of ways. And I imagine when it comes to trial in this case, if trial were to happen in this case, which we currently expect it to, it is, of course, our burden to prove beyond reasonable doubt what each of these men knew and what they intended. But you can read an email

multiple ways. And I'm sure that their side will have different readings of the same emails that we have.

And so our concern is that to the extent they just bring a general reasonable doubt defense, the government can't meet its burden of proof, every document could then be *Brady*. When you pile them all together, it doesn't meet the government's burden.

And so because what we've done is just turned over as much as we have, we have not separately created some kind of list of documents that we think are *Brady*. And I wanted to point --

THE COURT: Because you're saying that's subject to interpretation.

MR. ROTHMAN: Right. Right.

THE COURT: And why should your interpretation prevail over their --

[Unintelligible cross-talking.]

MR. ROTHMAN: We certainly -- I'm sorry.

THE COURT: No. No. You're fine.

MR. ROTHMAN: We certainly have guesses as to what their defenses might be. They're under no burden to tell us what their defenses might be. But I imagine they will be a mix of knowledge, intent, reasonable doubt. There's a case about estimates. And so to the extent that they're going to argue everyone knew these were estimates and we were all doing our

best; we had a good faith defense, I imagine all of that might come into play at a trial.

But the point is that, because of the kind of case that it is, it is not the kind of case where there's just some set of documents that is obviously *Brady* and some set of documents that's obviously not *Brady*. And so that is why we have never created such a list.

And counsel actually made that point, in part, where counsel said that they're still finding documents that they deem to be, quote, unquote, hot documents that we haven't identified as hot documents. That is bound to happen because, of course, we might not know exactly what is hot to them.

We have done as much as we can to be as fair as we can in this case, and we have taken what the court said in various cases that we've cited in our brief, including *Skilling* and others, hot documents -- we've even given them our tags.

So in these databases, Your Honor may know, you can say, this is a document that is important because it relates to issue one; it relates to shock; it relates to EACs or cost or the various issues. That's internal work product that we created that we gave them. These are the documents that we've categorized in various buckets. May be imperfect, but it's just one more way that we have offered to them --

THE COURT: No. I was going to say didn't y'all -- and I think I read this. I know in some of the -- I know

Justin Roller's done it in some of the big drug cases. Y'all reverse proffered pretty early on, right --

MR. ROTHMAN: We did. We reverse proffered --

THE COURT: -- where you just basically said, here's our -- not our whole case, but this is basically the crux of what we've got.

MR. ROTHMAN: So we did reverse proffer as to one of the defendants, the lead defendant.

THE COURT: Okay.

MR. ROTHMAN: As to Mr. Runkel and Mr. Adams, they each proffered with the government.

And as to Mr. Runkel, he was actually, at a time where he was in a cooperative posture with the government, given access to our internal database and he was able to tag documents and say, I think this is important; I think this is important.

And as to Mr. Adams, he also has met with the government. I hesitate to go too deeply into what --

THE COURT: No. I don't need you to. I just wanted you to confirm that.

MR. ROTHMAN: The other point I wanted to make, Your Honor -- and I'm happy to go into the case law in any level of detail, but, obviously, our brief does a nice job with that -- I hope it does a nice job with that I should say.

The Third Circuit case that we cite in our brief

*Pellulo*, P-E-L-L-U-L-O --

THE COURT: What page is that?

MR. ROTHMAN: We cite the *Pellulo* case -- it's one of the circuit cases -- at Page 7.

So in that case, when the Court looks at the facts of that case, this was a corporate case in which a defendant had multiple businesses and multiple places, that he had boxes of documents that were in one district and boxes in another and there were questions about whether all the boxes got turned over and things like that.

But what was important about that case is that the court talked about the idea that it is fatal to this kind of a *Brady* claim where a defendant has knowledge of or access to that *Brady* information.

And so in that case, he was the leader of this company and the court said, as the leader of the company, all of the documents are his company documents. So he knows, quote, unquote, where the bodies are buried. Right? He knows where everything is.

Here, we -- most of the evidence -- the vast, vast majority of evidence comes from their own documents, right, the Austal company, either via the search warrant that was done on their corporate headquarters or on documents the company gave to us over the course of our investigation.

These, you know, three men were in high-level

corporate roles in that company. They were at the meetings; they got the emails; they know what's on their various drives.

Counsel talked about the search warrant return and the metadata. I wanted to make a point about that which is we retained all of the file path data.

So when you're looking at a document -- in the search warrant return, for example, if you're looking for a document on the finance drive, you can filter the database to find documents from the finance drive or a subfolder of the finance drive.

We also collected paper documents during the search warrant return. And we've identified -- I'm just making up the box number. Box Number 1 comes from Runkel's office; box Number 4 comes from Adams' office. And so if they're thinking, oh, on my desk of the day of the search warrant, there was some exculpatory document; I recall that -- they can go find that piece of paper that they are equally in a place to find because they were at the company, leading the company during the government's investigation and actually even well beyond it.

My understanding is that Mr. -- is it the -- so Mr. Runkel, I believe, was let go right around the time of the search warrant. I believe Mr. Adams left a bit earlier than that. I believe that the CEO was there until about 2022 which was three years -- or sorry.

MS. CONNELLY: One year.

MR. ROTHMAN: One year after the warrant.

And so these -- all three of them are knowledgeable about the documents that might animate our case and also their case.

I'm just going through my notes.

THE COURT: That's fine.

MR. ROTHMAN: There are a set of cases that both sides have cited, *Saffarinia* and *Salyer* and *Blankenship* and, I'm going to pronounce it, Hsia, the H-S-I-A case.

Those cases are different from this case. Those cases -- Salyer was a person who was in jail pretrial. He had a small defense team, did not have access to the documents.

Here, they all have access to the documents. The clients could have access to the documents under the Court's orders. We're in a very different world.

Obviously, they have a very different defense team that was at issue in the *Salyer, Saffarinia* cases where they had much smaller pro bono defense teams.

Of course, that is their right to hire all of these great lawyers that I see in the courtroom. But it -- it does bear on the differences between those cases and this case.

And I also just wanted to note the case, *Skilling*, that both sides spent quite a lot of ink talking about is very similar to this case, dealing with the CEO of Enron.

It was a case involving a similar kind of accounting

fraud. And the same challenges were raised. In that basic concept, the government is under no duty to direct counsel to evidence within a -- you know, within this large mass of evidence is what that *Skilling* case found and what many of the other circuits have found.

And, at the end of the day, to the extent all that the defense is asking is for us to give them a list that doesn't exist -- I'm not sure how a list could be created at this juncture either, but if all they're asking is for us to turn over a list that doesn't exist, perhaps that's one off-ramp on this motion is we're here, telling the Court, there is no list.

I'm happy to pause for my colleague if there's anything else.

THE COURT: Anybody else on -- Mr. Bodnar? Okay.

MR. ROTHMAN: Thank you, Your Honor.

MR. STURDIVANT: Judge, may I respond?

THE COURT: Oh, certainly. Certainly.

MR. STURDIVANT: First of all, Your Honor, my client, Joseph Runkel, was not terminated until after indictment in this case. And I just want that noted for the record. He was allowed to continue working at Austal right up until the immediate week following the indictment.

As to the issue of whether there's a list or not, I was an assistant U.S. Attorney in the Northern District of Alabama. And whenever we had a -- an indictment to present to

a grand jury, it first went through an indictment review process. And we prepared a pros memo or prosecution memorandum. And one of the things we would do is identify problem areas in the case, weak spots in the case, defenses in the case. And these were largely derived from an examination of very -- not necessarily a law-review-article scope of focus but an examination of what the elements were, what does the government have to prove.

So if the government's position is that in an indictment in a case that is essentially analogous to the *Skilling* case, to the *Enron* case, it didn't do a pros memo; it didn't do an indictment review process, that's astounding. That's astounding.

So anything the government identified in that process is what we're talking about. And as the Court will recall and as the Court does I think in every case in this district, when the defendants were arraigned, the Court entered an order, directing the government to produce *Brady* information.

So that -- that obligation existed under the government's own policies and procedures, for it to have the indictment reviewed. And then, once the Court entered its order, that order was the law of the case.

And, here, we are not asking the government -- we're not asking them to do anything other than what they've already done, whether they want to call it a list or whether they --

you know, look at the pros memo and give us what the *Brady* information is in that. Because in this case, Judge, there's just an overwhelming amount of information.

The prototypical accounting fraud case is the *Enron* case or the *Skilling* case. And in that case, the government did what we are asking the government to do here. They identified the information that they determined to be *Brady*. They said, we're going to do that.

THE COURT: Okay. So let me back up a little bit.

So you're saying, we're not asking the government to do anything that they haven't already done. So I gave you a bunch of documents -- but you're asking them to categorize them better for you? Or -- I mean, you're not saying you don't have it; you're just asking them to go back and give you their opinion -- well, because you said it's *Brady*. You've said there's no *Brady* violation.

MR. STURDIVANT: We're asking -- if I may.

THE COURT: I'm just trying -- I know it's a fine line.

MR. STURDIVANT: We're asking to the extent that the government in any -- however it's described -- has undergone any sort of process or procedure to identify information that is *Brady* -- and it could be from the very early stages of the -- certainly the indictment review process -- we're asking for that information.

And if the government is saying they have no information at all where there's been any effort by the government to identify, to tag, to categorize, to file *Brady*, *Giglio* information, then I -- I would be astounded at that, again, because my understanding is that this is a standard operating procedure in every U.S. Attorney's office case, in every case in main justice.

There's an indictment review process, which makes sense. And it should be. It should be there as a way of sort of having somebody else look at what you think is -- you know, you're going to charge somebody with serious crimes, you want to be sure it's vetted. There's a vetting process that goes on. And as part of that vetting process, anybody who's a litigator is going to look at the strengths and weaknesses of your case. And where is their *Brady* information in that process?

THE COURT: To, like, follow up on your football analogy, you're asking for their playbook.

MR. STURDIVANT: Let me think about that one just a second, Judge. And I'm being serious when I say this.

MR. HELMSING: Well, Judge, if I might, we're not asking for their playbook. We're asking for their thoughts about what's good in our playbook.

THE COURT: Their mental impressions of --

MR. HELMSING: Yes, ma'am.

I mean, you know, it's -- I mean, I'm hesitant to get too far down the road about what mental impressions -- you know, I know that that gets us into a sticky --

[Unintelligible cross-talking.]

THE COURT: Well, because he said --

MR. HELMSING: -- direction.

THE COURT: -- you know, he said, some of these emails -- I mean, so you're asking them to make a determination that, okay, this email could go either way, but we're going to -- and then you're going to go, well, you identified that. I mean, I don't know. I'm just having a hard time separating the -- it all bleeds over.

MR. STURDIVANT: If I may, Judge, somehow whoever the DOJ prosecutor or assistant U.S. Attorney -- I've got it here in front of me. I don't know the identity of that person is particularly critical. But in this opinion, in the district court opinion underlying this *Enron* case, the government said, this is -- I'm going to read you if I may -- it's very --

THE COURT: Yes, sir. Is this the *Causey* case?

MR. STURDIVANT: Yes.

THE COURT: Okay.

MR. STURDIVANT: Quote, we recognize *Brady* is our obligation, and we are reviewing the documents and will continue to review the documents for any *Brady*. And if we find it, we will point it out. We are not going to, you know, rely

on them to somehow find it.

I mean, that is -- that is -- if there was ever a prototypical accounting fraud case, it was *Enron*.

Here, the amount of documents is not quite as massive, but everything is -- I mean, you know, it's like, you know, a hundred million pages versus 50 million pages or whatever, but it's the same concept. And the government in that case did that. The defense complained about that on appeal, and the court said, no; the government did enough here.

So it -- I don't understand myself how can the government in a case that is really on all fours with the types of behaviors alleged in this case -- how could the government somehow be able to identify *Brady* in that case and not in this case? And that's all we're asking.

And, again, we're asking for historical actions by the government. Historical categorization, filing, labeling, tagging -- however they did it. That's what we're asking for. We're not asking the Court to force them to undergo any current analysis or examination or review. That's not what we're asking for.

THE COURT: Okay.

MR. ROTHMAN: Judge, I don't mean to overstay my welcome, but just to answer what counsel said about --

[Unintelligible cross-talking.]

THE COURT: No. I wanted to hear from you on it.

MR. ROTHMAN: Thank you, Your Honor.

Of course, we had that process, the process of writing a pros memo and going through the indictment review process.

Without talking about our specific memo in this case to get into our work product aspects of that, what I will say, as a general matter, is that we identify in those memos and in those indictment reviews categories of possible defenses, categories of risks, and then we argue about how we plan to meet those defenses or meet those risks.

We do not in that environment provide a list, document Number 7 and document Number 30 and document Number 45 go to this defense; we just say, we think intent is going to be at issue in this case and here's how we plan to prove intent or knowledge or the estimates point I made earlier.

And I understand counsel's point that we, of course, have to do that process, but the process is not as granular as counsel is saying.

It is a, obviously, lengthy memo that talks about a great many things but does not specifically point to documents that we have identified as falling into those potential defenses or risks.

There just is no such list in this case or, frankly, it -- any case that I have prosecuted.

MR. BODNAR: And, Your Honor, just to point out because I think it's been brought up -- and Your Honor knows

how our office handles cases.

So you've seen times where we do have lists like that, but they would be in a case more of the bank robbery or the drug dealing where it is hey; we know that, you know, witness X said it wasn't Jim; it was Tom that sold me the drugs. Well, there, you've got specific things you can answer.

But when it is more the amorphus "did they know, did they have the knowledge, did they have the intent," which is what is at stake here, that's why there's not the granular of going down to the actual level.

So there are times where pros memos will potentially identify specific documents, hey, this 302, they said it wasn't the defendant that dealt the drugs or we've checked this pole cam; he's not on it. In instances like that, we would have that. But that's not the nature of this type of case and that's why there's not a list like that in this type of case, Your Honor.

MR. STURDIVANT: Your Honor?

THE COURT: Yeah. I was gonna say -- yeah, go ahead.

MR. STURDIVANT: At the risk of overstaying my welcome, may I make just one additional point?

What I would ask the government is: Is the government's position that they are not aware of any document in this case that is favorable to any of the defendants from an exculpatory standpoint or from a *Giglio* witness credibility

standpoint? Is that -- is the government actually saying it has no idea of any documents that are in that category?

MR. ROTHMAN: No. We are not -- we are not saying that. There are, of course, documents that could be read different ways, that could be read that are favorable to them, that could be read favorable --

THE COURT: But you've turned them over.

MR. ROTHMAN: -- to us. We've turned it all over.

THE COURT: You just haven't identified them as per --

MR. ROTHMAN: We have identified documents as hot documents. We've given --

THE COURT: Right. And I know and I've been -- and I've pressed the government at all the hearings to do that. And --

MR. STURDIVANT: But, like, for example, the reverse proffers, Judge -- you know, reverse proffers are not places where, as defense counsel, you hear about exculpatory documents. A reverse proffer is to convince the defendant --

THE COURT: Right. To show you -- yeah -- what we have.

MR. STURDIVANT: We're going to show you our cards.

THE COURT: Right. Right.

MR. STURDIVANT: And, again, I just think we need to be clear about the nature of these meetings and that sort of thing. But anyway.

Thank you, Your Honor.

THE COURT: Anything else for either side on the motion about *Brady* before we move on? Okay.

MR. ROTHMAN: No, Your Honor.

THE COURT: All right. Well, let's move to defendants' joint motion to compel review of the SEC's investigative materials.

MR. MARSHALL: Thank you, Your Honor.

THE COURT: Okay. You fielding this one? Okay.

MR. MARSHALL: Yes.

THE COURT: Let me -- hold on. Let me get to my -- here we go. Okay.

MR. MARSHALL: Your Honor, just to start out, I think what's important is just to put forth what we think is the standard here.

We think that, in this circuit, the circuit has adopted the following: It's a case-by-case analysis of the extent of interaction and cooperation between the two agencies that is at issue -- which is the analysis for whether a joint investigation occurred. And if a joint investigation occurred, then the department of justice has an obligation to look through the files of the other agency for *Brady*.

And we think, under the facts here, we do have a joint investigation. DOJ and the SEC worked cooperatively and jointly for over five years, and they conducted approximately

45 separate witness interviews.

We have not found a case, Your Honor, where that many witness interviews were conducted by both DOJ and the SEC.

They further coordinated the commencement of their enforcement actions with the indictment issuing on March 30th of 2023 and the SEC filing a complaint the next day, March 31st, 2023.

They also coordinated, we believe, media efforts, both issuing press releases on March 31st, 2023.

And, you know, given all that, Your Honor, we think -- and to be clear, we still do not know the entirety of the interactions between the SEC and the DOJ.

Sometimes in litigation on these types of motions, the DOJ will put forth all of the steps that they -- you know, all of the interactions that they had with the other agency.

DOJ did not do that in response to our filing. But, you know, there were certainly -- in addition to these interviews, there may well have been calls, meetings, strategy sessions, et cetera. You know, more -- even more indicia that there was significant interaction and cooperation between the two agencies.

So we do think that -- and I should also note, Your Honor, the department put in -- on Page 2, they had a footnote where they said that the SEC did not take notes at these interviews; rather, a law enforcement agent did. That agent

then transformed his or her notes into a memorandum and the SEC would come over and an attorney would take notes off that.

I mean, to my mind, that indicates even further interaction and cooperation between the two agencies of which we don't have, you know -- and we don't have visibility into all of that.

But certainly we think, you know, given all that, Your Honor, the Court is well within its discretion of ordering DOJ -- you know, finding that there was a joint investigation and ordering DOJ to go through those files to look for *Brady* information.

We cite to the following cases: There's the *Gupta* case out of the Southern District of New York, the *Martoma* case out of the Southern District of New York, and a case out of Illinois called -- entitled *Bases*, B-A-S-E-S. We think those are fully supportive of our position.

We concede, Your Honor, that there are other district courts that have come out, you know, differently under, you know, certain facts, but it is a fact-intensive analysis. And we think that, you know, given all that we have here, particularly the very high number of having almost four dozen interviews being conducted by the agencies, you know, at the same time, means that, at the end of the day, this was, in fact, a joint investigation and, therefore, the SEC was part of the prosecution team and DOJ has an obligation to search their

files for *Brady* information.

THE COURT: Okay. Who's handling --

[Unintelligible cross-talking.]

MS. CONNELLY: Yes. Thank you, Your Honor.

We agree with defense counsel about the standard. It obviously is a case-by-case analysis. But I think where defense counsel is not engaging as much is what the factors that the *Moon* court set forth in order to do that case-by-case analysis. That includes a pooling of investigative energies and resources, joint meetings, actions taken by other agency personnel under the supervision and direction of the federal prosecutor, and any other information suggesting the SEC functioned as agents of the federal government and the federal prosecutor under the principles of agency law.

Those are very specific factors really tied and geared towards determining whether the SEC was an agent of the United States in this case. And, here, it's just very clear that those factors are not met.

There was no pooling of investigative resources here. While there were joint interviews -- there were 44 -- that was of the 180 that were conducted in this investigation. This is a massive investigation. And so while the government acknowledged 44 is -- or 45 -- it might have been 45 -- is more than the 44 that the court deemed, you know, to be the amount that made it a joint investigation in *Gupta*, this is not the

same case. Right?

This is a case where only 45 interviews is only 25 percent of the interviews that were conducted in this case. It's a pretty -- it's a less significant amount than the amount that was kind of deemed the bright-line-crossed amount in the *Gupta* case.

The SEC was never and was not supervised or directed by the DOJ in this case. And there's simply no information suggesting that the SEC functioned as agents of the federal government.

The SEC operated and did its own parallel investigation of the defendants and of the company in this case. There is nothing improper about engaging in a parallel investigation, and there's nothing improper with coordinating parallel investigations in order to promote efficiency as was done here with the joint interviews.

And so, at the end of the day, under the *Moon* factors, really that should be the end of the inquiry for the Court because the *Moon* factors are just not met.

Turning --

THE COURT: Let me -- hang on just a second --

MS. CONNELLY: Yes.

THE COURT: -- before you move on.

So I'm looking at Page 5 of 207 in your brief.

It says, unlike *Gupta*, the SEC did not take any notes

or prepare any memoranda of the interviews. But you do acknowledge what they just said, that the agents working on the criminal investigation with the DOJ took notes --

MS. CONNELLY: Yes.

THE COURT: -- from the SEC?

MS. CONNELLY: No.

THE COURT: No.

MS. CONNELLY: The agents of the criminal investigation, they were the ones that were the notetakers in the interview.

THE COURT: Okay.

MS. CONNELLY: They took the notes. They then turned those notes into reports.

THE COURT: Okay.

MS. CONNELLY: The defendants have both the notes and the reports.

THE COURT: And the reports. Okay.

MS. CONNELLY: The -- I think what they may have been referencing is after the interviews, of course, given that the SEC did not take notes, they wanted to have a record of what was in those interviews, so they were provided access to read-only copies. They were allowed to look at those, take notes to summarize for themselves what was in them. And those, I presume, were -- are in their files, though I can't speak to that.

But unlike the *Gupta* case where the SEC attorneys also didn't take notes but went back to their offices and basically wrote down mental impressions and wrote down notes of what they remembered without the benefit of looking at a report to do that, that was what the court ordered turned over in *Gupta*. And, here, that just didn't happen.

So under the *Gupta* standard, we've actually already exceeded it, even if the Court were to order us to turn over notes of the SEC.

THE COURT: Okay.

MS. CONNELLY: I can --

THE COURT: Hold on. She -- I had interrupted her, but I'll give y'all a chance.

MS. CONNELLY: Thank you.

So but turning to *Gupta*, I think *Gupta* is a very specific case. Right? And we've cited cases to the Court about how it's an outlier even within its own district, and I won't belabor that point. But I think it is worth mentioning that the *Gupta* court, actually -- and *Martoma* as well, which is the other case cited by the defense -- the remedy there was actually very narrow. The request was very narrow. It wasn't a request to search the entire SEC file. It was a request for very specific information that the defense was looking for.

In the *Gupta* case, it was for the notes that the SEC had taken and, in the *Martoma* case, it was for the -- the notes

or any communications related to the cooperator in that case.

And if you read those opinions, it seems to animate that -- both those courts that what we're talking about is a very specific request.

*Gupta* in particular -- and I -- it seems that many of the *Gupta* judge's colleagues disagree with his approach in that case, but seems to say that it's really they were only joint for these interviews, so, therefore, the obligations are only over the joint interviews. They're not a joint investigation more generally.

I think under *Moon* and under the Eleventh Circuit case law, that would not be an appropriate analysis to employ here. But it's worth noting that those cases are very narrow holdings and, as I said, outliers in their own district.

In terms of the press release, just to address that very quickly, again, the fact that charges were announced close in time and that press was coordinated similarly just fails to establish that the investigations were joint and the -- we have cited to you a Southern District of New York case that analyzed this exact issue that included both joint interviews and, actually, in that case, a joint press conference announcing charges beyond what we have here. And the court noted that there was nothing improper about that and basically said, that shows cooperation just as much as it could show a joint investigation, and cooperation does not equal a joint

investigation.

If the Court has any additional questions, I'm happy to answer them.

THE COURT: Let me see.

No. Okay.

MR. MARSHALL: Your Honor, thank you for letting me make a few points in response.

So, Judge, Ms. Connelly talked about the 180 interviews that the department conducted and that only 45 were conducted with the SEC.

We want to point out to the Court that there was a whole other kind of topic of investigation that the department of justice was looking into, and the SEC was not part of that investigation.

That would not have -- if there had been misconduct that was chargeable -- and there were no charges brought with regard to that portion of the investigation -- that kind of conduct would not have implicated the SEC's jurisdiction.

And so there was a whole portion of investigation that DOJ did on its own that did not result in charges that the SEC was not part of. And that probably makes up a very material amount of those interviews that were not conducted with the SEC.

Your Honor, you know, conducting joint interviews is, of course, a pooling of resources. We do think the Court would

be well within its discretion to, you know, inquire of the department in response to our motion what else -- you know, what other activities did the agencies engage in together, meetings, strategy sessions, et cetera, which might give the Court a fuller picture of the SEC's role vis-à-vis the department of justice.

I wanted -- counsel seemed to be implying a little bit that agency is the ultimate issue here, but it's not. Whether the other agency was acting as an agent is one of the factors that goes into the analysis. It is not -- it is not the factor. In other words, we don't have to show that the SEC was the agent or acting, you know, totally at the behest of DOJ here. We just need to show that there was, in fact, a joint prosecute -- a joint investigation. We think that we have done that.

Your Honor, *Gupta* is not an outlier in the Southern District of New York. There's also -- one of the cases we cite is *Martoma*. *Martoma* is from the Southern District of New York. And of course we've also cited that case from Illinois.

And so, at the end of the day, you know, 45 interviews conducted together is really an astounding number, I think, compared to other -- to the case law that's out there. It is -- it is the high watermark of joint interviews that are done by the two agencies.

And, you know, we think that, in conjunction with all

of the other factors we have cited as well as any other factors the Court may compel the department to, you know, proffer to the Court -- we think, at the end of the day, there was a joint investigation and would ask the Court to have -- order the DOJ to look through the SEC's materials for *Brady* information.

THE COURT: All right.

Anything else from the government?

MS. CONNELLY: Your Honor, I'd just note that I think there's no magic number of interviews that ultimately turns this into a joint investigation. And I would say that I think the fact that there was another investigative avenue that the DOJ was looking at highlights even more for the Court why this was not a joint investigation. Because, even if 180 interviews, some of them pertain to another -- another line of kind of investigation that was going on, that doesn't necessarily turn this -- mean that the 180 doesn't matter in the Court's analysis of evaluating 45 in the scope of the amount of investigations that DOJ did.

I'd also just note the *Blaszczak* case out of SDNY. The USAO and SEC conducted 39 interviews together. The court blessed that. And that was in the context of only 21 additional interviews being conducted outside the presence of the SEC.

So this is certainly not abnormal, particularly -- except maybe in the sense that this case is large and maybe

more interviews were conducted than in other cases.

THE COURT: Okay. All right. So let's move on to the issue of international travel.

So Document 204, United States' motion to take the trial deposition -- I don't see the name -- I have the name written down. And it's somebody that the defendant identified. And the defendant has an opposition at 206.

Who's going to do this one?

MS. CONNELLY: I will be doing this one, Your Honor.

THE COURT: You got this one again? Okay.

MS. CONNELLY: I think the parties agree upon the standard here which is articulated at -- by the *Drogoul* court in the Eleventh Circuit in *Drogoul* which is that, under Rule 15, a movant -- that would be the government here -- must establish the witness is unavailable to testify at trial and that injustice will result because the testimony material to our case will be absent. And, here, we have met that standard is what we would submit.

And so to start with, Mr. Gill is unavailable, and we've established that. I'm happy to give the Court a more fulsome proffer about his unavailability. That is something --

THE COURT: I mean, I think that was one of the arguments they had in there, that you all hadn't -- let me get to where it is --

MS. CONNELLY: Yes.

[Unintelligible cross-talking.]

THE COURT: I'm, like, reading the end of the book here, but I made a note about that, that they --

MS. CONNELLY: Yes.

THE COURT: Well, if you know, we'll just go ahead then.

MS. CONNELLY: Well, I think the defendants have said that, under *Drogoul,* there's a requirement that the government establish by affidavits or otherwise that the prospective witness is unavailable.

I think they are not looking at the "or otherwise" part of this, and courts have repeatedly blessed the idea that a foreign witness beyond the subpoena power of the court is unavailable and can be deemed unavailable, particularly when the government comes and gives an oral representation or another party gives an oral representation that the witness is unavailable in a foreign country.

And I'll just cite to you -- and I'm sorry this isn't in our original brief, but --

THE COURT: Okay.

MS. CONNELLY: -- in light of the argument, *United States v. Farfan*, F-A-R-F-A-N, *Carreon*, C-A-R-R-E-O-N. That's a Fifth Circuit case. It's 935 F.2d 678. And in that case, the Fifth Circuit held that counsel's representation in open court sufficed for the purposes of establishing unavailability,

expressly rejecting the idea an affidavit needed to be submitted in order to establish that.

And in that case, the representation was that the witness was a foreign national beyond the subpoena power of the court which is exactly what we have here.

Again, I am happy to give a more fulsome proffer of the circumstances of Mr. Gill if the Court would like it. But I think the cases establish and there are other district court cases that establish that a representation of the government that he's unavailable should suffice for these purposes.

THE COURT: All right. So not that I've made a decision, but -- where is that? On the top of Page 9, assuming that you win the motion -- and, again, I'm not making -- I'm just jumping to the next -- if the Court permits Mr. Gill's deposition, it should order the government to pay the defendants' and their attorneys' costs to attend the deposition in person. What's your position on that?

MS. CONNELLY: Obviously, it's -- it is within the Court's discretion. Rule 15 makes that very clear; that the Court must order that if the defendants aren't capable of paying. Or it may in certain circumstances.

I think here, where we have very well-financed and well-resourced defendants, there being -- as the defense, I think, has repeatedly filed with this Court, there's an insurance carrier that is paying for the defense in this case,

I'm not sure that it -- this is a circumstance that warrants the payment for travel of attorneys and defendants to attend the deposition. But the government acknowledges that that is within the Court's discretion.

THE COURT: And I skipped over -- I think you all had not even gotten to that point. You all said do it virtually, and they argue that that doesn't preserve the constitutional right of cross-examination.

MS. CONNELLY: Yeah.

We are not asking that this be done virtually over the defendants' objection.

I think the point of offering a virtual option was simply to say that, given that, while this testimony is critical to the government --

THE COURT: Obviate the need for travel?

MS. CONNELLY: -- it -- exactly. If, at the end of the day, we're talking about an hour-long deposition, traveling to Australia may not make sense. But of course the defendants have a right to confront the witnesses and they have a right to attend in person, and we would go ahead with that.

THE COURT: Okay. All right. Who's going to field this one?

MR. MARSHALL: Your Honor, I am again.

THE COURT: Okay.

MR. MARSHALL: Just, Your Honor, we do think -- and I

appreciate there is that Fifth Circuit case, but I think that -- you know, the law within this circuit, *Drogoul*, *Alvarez*, *Sencan* -- I think that those cases establish that the government has an obligation to demonstrate probable unavailability of the deponent through affidavits or otherwise and some other kind of documentation. For example, in *Sencan*, there was a doctor's note with regard to the defendant's poor health.

But, you know, here, the government hasn't done that. It's just a bare assertion from counsel that this witness is unavailable.

The other thing, Your Honor, is that we don't have any proffer from the government with regard to any due diligence that they've done with regard to trying to get this witness here to the United States.

You know, we don't know whether they -- you know, what steps they've taken to secure this witness' presence. You know, for example, did they make a request under the Mutual Legal Assistance Treaty between the United States and Australia? They could have done that and requested that Australia request that Mr. Gill come to the United States for the deposition. You know, but we have -- we don't -- they did not put in their motion that they had done that.

So we don't think, given the lack of due diligence, given the lack of substantiation with regard to

unavailability -- we don't think the government has shown -- we don't think that they've met the unavailability prong.

And, Your Honor, more than that, you know, with regard to the second prong, they need to show that absence would result in an injustice. And the principal consideration of injustice is the materiality of the testimony. And the proper inquiry vis-à-vis materiality is that the testimony must be critical to the case. But we have -- we have nothing in the government's filing, Your Honor.

They did not address how Mr. Gill's testimony would not be redundant, would not be cumulative to other witnesses, or -- and they did not represent how his -- their inability to put forth his testimony -- how that would hurt their case in chief. There's no representations with regard to that. And so, you know, we think that, with regard to the injustice prong, they also haven't met their burden.

And I should note, Judge -- and I probably should have said this at the outset -- it is the government's burden to establish exceptional circumstances under Rule 15.

And I think it's important, too, that we keep the context, you know, front of mind here, and that is that depositions are disfavored in criminal cases and that foreign depositions are considered suspect, you know, for all the obvious reasons. Right?

We don't know whether -- you know, would the perjury

requirements apply; what procedures would be followed. You know, the government is suggesting a virtual process. You know, would we really be able to engage in vigorous cross-examination, you know, using that process? You know, if Mr. Gill is in Australia, what would the procedures be? We don't know.

So I don't think the way the government put forth their motion -- I just don't think that they have met either the unavailability prong or shown that an injustice would be rendered if they did not -- were not permitted -- you know, were not able to get Mr. Gill to trial.

I would also note that, you know -- so I think the government made -- gave an explanation as, you know, in their view, why Mr. Gill's testimony is admissible. But, again, admissibility -- that's not what we're talking about

THE COURT: Right.

MR. MARSHALL: They need to make a showing that he's a critical witness.

You know, we have through the discovery process -- and at the end of the day, Your Honor, Mr. Gill is what I would call a materiality witness, you know, whether certain information was material. He was an analyst at JPMorgan. Was it material to his assessment of recommendations to advisors, you know, about whether to invest in the company. But Mr. Gill -- he was not even an investor, simply an analyst at

JPMorgan.

We have received from the government information about other witnesses from who -- who actually were investors in Austal, who bought and sold Austal Limited stock on behalf of their clients. And at least one of them we know was served with a trial subpoena. The government has provided us information with regard to those witnesses.

They've also disclosed an ostensible securities market analyst who presumably would talk a lot about what Mr. Gill would talk about, the securities markets, changes in price and trading volume of Austal Limited stock, and the -- how the stock responded in response to company announcements in December of 2015 and July, 2016.

All of that, Your Honor, is a way to say that it appears that Mr. Gill, in fact -- his proffered testimony would be cumulative and duplicative of other witnesses and not at all critical to the government's presentation in this case.

So, as written, Your Honor, we think that the government's Rule 15 motion is lacking and that they have not met their burden here.

THE COURT: Okay. So I'd like for you to address some of those things. And I think he skipped over it.

Why is he -- why go to all the trouble for this individual?

MS. CONNELLY: Yeah. Yeah. Exactly. So Mr. Gill is

very differently situated than any other witness in this case.

Mr. Gill was an analyst at JPMorgan. He covered the stock at the time of the scheme period. So he actually wrote reports and covered the stock and was meeting with Austal management at the time of the scheme period. This included actually meeting with Craig Perciavalle at some point.

And so, to be clear, his role is very different than that of an investor victim or someone who's going to come in and provide summary testimony on behalf of the government about stock price.

He can actually testify about what was happening in the market at the time and what he was hearing from the company at the time about its financial position and other corporate announcements that were going on.

That puts him in a very different situation than, also, investor victims who -- investor victims are, you know -- I -- I hesitate to use this word, but investor victims who have money wrapped up in this stock, right, they're less objective than a analyst covering the stock who is providing objective and wholistic analysis about the fundamentals of the stock, what's going on with the stock price, what is important that's coming up.

He's analyzing certain Navy contracts that could be coming. He's looking at the picture of government funding. He's really -- his whole job is to know everything about this

company. And he did that job during the scheme period in this case. So his testimony will highlight all of that.

The reason that the -- we cited to you these cases about analysts' testimony where -- concede those aren't about Rule 15 depositions, right, but they highlight for the Court why this type of testimony is used very often in securities and accounting fraud cases. It's because it gives a different picture about the materiality of this.

And I just want to be clear that Mr. Gill is a fact witness because he actually covered the stock during the relevant time period.

THE COURT: So that's why it's -- you say the general rule --

MS. CONNELLY: Yeah.

THE COURT: -- that we usually don't do depositions in criminal proceedings -- this is a different --

MS. CONNELLY: Yes.

THE COURT: Because of the nature of the charges.

MS. CONNELLY: And while the government acknowledges, obviously, the language out of the *Drogoul* case and other cases, that foreign depositions are, you know, treated with suspicion, there is a -- there is a procedure for foreign depositions. Rule 15 explicitly allows it. So that is why we submit that we have met that burden.

The other thing I just want to highlight -- and we put

it in our briefing -- is that, here, it would be particularly unjust, especially at this stage where we're simply seeking to preserve this testimony and have it available to us, given the defense's own expert disclosures that one of their experts apparently wants to come in and testify about Mr. Gill's reports himself, which, you know, I think we'll have a lot of lively discussion about whether that's going to be appropriate or not. But given that that's something that the defense has noticed as potential expert testimony is that their expert is going to come in and testify about the reports, it would be highly unjust to the government to not actually allow the government to preserve the testimony of Mr. Gill who can talk to the Court and talk to the jury about what those reports actually meant.

And so instead of having a paid expert who gets up and says, this is what I think the reports mean, you can actually have the testimony of that person. And so -- and the *Drogoul* court itself, if you read the *Drogoul* case, the testimony that was preserved actually was about the defense case and that is -- that is actually the testimony that was preserved.

THE COURT: Okay. Anything else?

MS. CONNELLY: I do think I should just address maybe the unavailability point just briefly --

THE COURT: Okay.

MS. CONNELLY: -- on these -- on these cases that are

cited.

The *Drogoul* case is -- regards an Italian process. And, essentially, in that process, it appears from the case that the Italians did not allow the government in that case to actually speak to the witnesses directly. So they had to go through this formal process with Italy.

Here, Australia -- and I will make the representation to the Court -- a request was sent under the Mutual Legal Assistance Treaty in order to speak with Mr. Gill. Australia had said to the United States that you are free to -- if witnesses will engage with you voluntarily, to go that route instead. So that's how we wound up in a more voluntary posture with Mr. Gill and aren't going through the Australians.

Given that the *Drogoul* court had to have kind of compelled testimony out of Italy because they weren't engaging with them directly, it's just a different position.

So I can see no benefit to us asking the Australians to ask Mr. Gill to do something when we are already engaged with him and his counsel.

Also, just the *Sencan* case -- that related to a doctor's note. It's not actually clear to me reading that case that that doctor's note was actually submitted or if the United States just made the representation that they had the doctors' note. But I'd also note that that's a case related to a domestic witness who is within the subpoena power of the United

States. So assuming that they got a doctor's note for that is just a different circumstance.

THE COURT: Okay. Since it's y'all's motion, yes, sir.

MR. MARSHALL: Your Honor, can I just make a couple more notes?

THE COURT: Sure.

MR. MARSHALL: Your Honor, just with regard to the -- on the issue of the critical testimony, so, again, the government has turned over information to us with regard to other witnesses who did, in fact, buy and sell Austal Limited stock on behalf of their clients. Those witnesses of course engaged in analysis, made assessments with regard to the company, with regard to company announcements, et cetera. So they really are in a very similar posture to Mr. Gill.

And the other thing I would say is I just -- I don't really understand -- I don't -- I would imagine that the government's examination of Mr. Gill will have nothing to do with our Rule 16 expert notice. Maybe I'm missing something, with that, but I just don't see -- I don't really understand how our expert notice -- we have an expert who reviewed, you know, many analyses that were done at the time -- during the relevant time period by analysts, market analysts. I don't understand how that would somehow trigger that that makes Mr. Gill's testimony critical here from a Rule 15 perspective.

THE COURT: Hang on. Let me let her address it before we go.

MS. CONNELLY: Yeah. I'm happy to answer.

So the statement in the Rule 16 disclosure is Dr. Choi is expected to testify based on an analysis including reports by JPMorgan that market sentiment during the period of the alleged fraud took into account potential risks to margin and performance of the early Littoral Combat Ship vessels.

THE COURT: For the record, I believe this is Exhibit A to your Document 204.

MS. CONNELLY: Yes. Yes. Thank you. On Page 3.

That suggests to me that Dr. Choi plans to say, I've read these analyst reports and I can tell you that, based on reading them, the market had already taken into account these risks.

THE COURT: And you want McGill to rebut that.

MS. CONNELLY: Yeah. And Mr. Gill can say --

THE COURT: Or Gill.

MS. CONNELLY: -- and I imagine his testimony would be -- and this is documented in a report of interview that was sent over to defense counsel that he did not know that there were other estimates and he would have wanted to know that, if there was a different financial picture.

So to allow an expert to come testify about the content of those reports and say that that means that the

market was already on notice of certain risks and performance risks would be unfair to the government to not actually have the writer of those reports at least have his testimony preserved such that, if this becomes an issue, it's available.

THE COURT: Okay.

MR. STURDIVANT: Your Honor, if I could just very briefly address a couple of points.

THE COURT: Sure.

MR. STURDIVANT: First of all, it is true that coverage exists for defense costs in the case, but, you know, coverage doesn't last forever. There are limits. This has been a costly case. It continues to be. There's also a -- in the wings, if you will, an SEC civil lawsuit with a 50-page complaint that has been stayed pending the resolution of the criminal case. So we have in front of us -- these three gentlemen have still many miles to go before this matter ends.

Secondly, the fact that -- if the Court -- and I would submit that it's really not even a close call, but if the Court were inclined to find that the government has met its burden here, despite the fact that depositions in criminal cases, especially in foreign countries, are heavily disfavored -- but if the Court did find that it would allow the deposition to go forward, then we would ask that the Court order the government to pay the costs of one attorney and each defendant, each party defendant, to go to Australia for this deposition so that they

can confront, within the meaning of the confrontation clause, this witness.

And there is -- you know, there's been many, many, many instances where costs are reviewed. There is no guarantee that the carrier will pay these costs. If the carrier didn't pay the cost, then the defendants would have to either pay for it themselves or forgo their right to a in-person examination of the witness.

And, again, given, Your Honor, that this could, in fact, be testimony that the jury hears at trial, we -- we would be remiss in our duties, as defense counsel, if we were to allow this to merely be done by videotape, some format.

Thank you.

THE COURT: Okay. Anything else?

MS. CONNELLY: I wanted to just -- apologies.

In terms of procedure, I think for costs and for other procedures related to how Australia would set up, for example, putting people under oath and other -- whether they would be subject to the rules of perjury, I think that's a question on the admissibility stage.

And I just cite to you the *Drogoul* case that says the court's concerns about the procedures surrounding the depositions are best addressed if and when the government seeks to introduce the depositions in evidence.

THE COURT: Okay. Anything else on anything, any of

the other ones that you just remembered? No?

Okay. So I already have some preliminary thoughts from reading them, but I don't like to just make a decision because a lot of times I've learned over the years the oral argument gives me other things to think about, and y'all have done that today. Y'all both have done your jobs or both sides have done good jobs. I guess good jobs in the fact that I need some time to take it under consideration.

But I know we finally got this moving along. We need to keep our pace up. So I'll have orders out next week.

Thank you, counsel. Y'all have a nice weekend.

(The Proceedings were concluded on May 15, 2026.)

C E R T I F I C A T E

I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out to the best of my ability, as the same was recorded by digital court recording and later taken down by me in stenotype and transcribed utilizing computer-aided transcription.

This is the 17th day of July of 2026.

Cheryl K Powell

Cheryl K. Powell, CCR, RPR, FCRR
Federal Certified Realtime Reporter